## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

**TONY J. WALTON,**

       **Petitioner,**

**v.**                                                      **Case No. 2:15-cv-11423**

**DAVID BALLARD, Warden,**
**Mt. Olive Correctional Complex,**

       **Respondent.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court are Petitioner's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 1), Motion for Partial Summary Judgment, (ECF No. 16), and Motion for Post-Conviction Bond, (ECF No. 23). Also pending is Respondent's Motion to Dismiss the Petition as Untimely, (ECF No. 11). This case is assigned to the Honorable Thomas E. Johnston, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

The undersigned notes that the record before the Court is well-developed and provides a sufficient basis upon which to resolve this matter without need for an evidentiary hearing. *See* Rule 8, Rules Governing Section 2254 Cases. Having thoroughly reviewed and considered the record, the undersigned **FINDS** that Petitioner's § 2254 petition is untimely under the one-year statute of limitations set forth in the Anti–

Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Respondent's Motion to Dismiss the Petition as Untimely, (ECF No. 11); **DENY** Petitioner's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 1); **DENY** Petitioner's Motion for Partial Summary Judgment, (ECF No. 16); and **DISMISS** this case from the docket of the Court. In addition, given the aforestated recommendations, the undersigned further **RECOMMENDS** that Walton's Motion for Post-Conviction Bond, (ECF No. 23), be **DENIED.**

## I.    Relevant Factual and Procedural History

On December 11, 2009, Petitioner Tony J. Walton ("Walton") was found guilty of one count of first-degree robbery and one count of assault during the commission of a felony after a two-day jury trial in the Circuit Court of Fayette County, West Virginia. (ECF No. 13-1 at 384). The robbery occurred at the Family Dollar store in Mount Hope, West Virginia, when its manager, Lisa Castanon, was arriving to open the store on December 24, 2008. (*Id.* at 161-66). At trial, Ms. Castanon testified that she unlocked the store's door at approximately 7:30 a.m. and entered the break room to obtain the bank deposit and petty cash bag when she heard a noise coming from the back of the store. (*Id.* at 163-66). She turned to see an intruder standing in the doorway of the break room with a piece of PVC pipe in his left hand. (*Id.* at 167). The intruder struck her on the head with the pipe, and a struggle ensued over the money in Ms. Castanon's possession. (*Id.* at 167-68). At some point, the intruder pushed Ms. Castanon into a collection of mirrors, causing her fall to the floor. (*Id.* at 169-70). From the floor, Ms. Castanon covered her face and sprayed her attacker with pepper spray; the attacker fled the store. (*Id.* at 171). The evidence presented at trial demonstrated that Ms. Castanon was injured during the attack. (ECF

No. 13-1 at 170). One photograph of the floor at the site of the struggle clearly showed a blood stain. Howard Canterbury, Chief Deputy of the Fayette County Sheriff's Department, testified that someone had apparently stepped in the blood on the floor, or "something ha[d] gone through" it. (*Id.* at 85).

Ms. Castanon's identification of Walton as her assailant was a key issue in dispute at trial. Soon after the robbery, Ms. Castanon described her attacker to a 911 operator as a "very very black" male and informed the operator that he was wearing brown gloves and a grey hooded sweatshirt. (ECF No. 16-1 at 5-7). Ms. Castanon subsequently informed Chief Deputy Canterbury that her attacker was a black male with a light complexion, who was six feet one inch tall, 170 pounds, and was wearing a hoodie and gloves. (ECF No. 13-1 at 94). The day of the robbery, Ms. Castanon also provided a written description of her attacker wherein she stated that "he was a black man about 6'2 or 6'4, about 170-180[,] wearing a dark grey hoodie and black sweat pants." (ECF No. 16-1 at 9). Within "hours" of the robbery, Ms. Castanon was shown a photographic lineup of suspects, and she identified Walton as the man she saw in the store; however, the law enforcement officer who performed the photographic lineup did not testify at trial. (ECF No. 13-1 at 97-98). Instead, Chief Deputy Canterbury, who discussed the results of the lineup with the officer later that day, testified (without objection) that Ms. Castanon selected the photograph of Walton. (*Id.*) At trial, Ms. Castanon again identified Walton as the man who attacked her. (*Id.* at 178). She also testified that her assailant's hair was partially braided. (*Id.* at 173). On cross-examination, Walton's counsel, Elizabeth Kearney, impeached Ms. Castanon about the discrepancy between the description she provided to the 911 operator and the description she provided to Chief Deputy Canterbury. (*Id.* at 184-86). Ms. Castanon responded that she did not recall the description she gave to the 911 operator, but she did

not dispute that she had provided that description. [1] (*Id.* at 185-86).

Naturally, Walton's whereabouts at the time of the robbery were also hotly contested. Several alibi witnesses testified on Walton's behalf. Walton's brother, Kevin, recalled that on the morning of the robbery Walton was at their parents' home, where both Kevin and Walton resided, and he left sometime after 8:00 a.m. to ride Kevin's four-wheeler. (*Id.* at 211). On cross-examination, Kevin conceded that he had never told the police that Walton was at home on the morning of December 24, 2008. (*Id.* at 215-16). Walton's mother, Paula, remembered that Walton came home around 11:00 p.m. on December 23, 2008, and he was in bed at 6:30 or 7:00 a.m. when Paula awoke on December 24. (*Id.* at 222, 224). Paula remembered that Walton got out of bed sometime after 9:00 a.m. and left the house. (*Id.* at 224-25). Paula further testified that Walton's hair was not in braids that morning. (*Id.* at 226). On cross-examination, Paula admitted that she did not tell the police about Walton's whereabouts when they asked her for a statement in June 2009. (*Id.* at 229-30). Walton's father, also named Tony J. Walton, testified that he saw Walton arrive home the night of December 23, 2008, and next saw him at 8:30 or 9:00 a.m. the following morning when Walton left to go four-wheeling. (*Id.* at 235-36). Walton's father, whose bedroom is across from Walton's bedroom, added that he did not hear Walton leave at any point in the night. (*Id.* at 236). Walton's friend, Don Barrett, testified that he saw Walton riding a four-wheeler at approximately 9:30 a.m. on December 24, 2008. (*Id.* at 255-56). At that time, Walton stopped the four-wheeler to speak with Barrett and informed Barrett that he had heard about a robbery at

---

[1] Walton makes much of the fact that his trial was Ms. Kearney's first criminal jury trial as the lead attorney. (ECF No. 13-9 at 26). The Chief Public Defender for Fayette County, Nancy Fraley, planned to sit second chair during Walton's trial, but another senior attorney in the office, Steve Adkins, had to step in when Ms. Farley was stricken with pneumonia one week prior to the trial. (*Id.* at 46).

the Family Dollar store. (*Id.* at 256).

Walton testified that he arrived home sometime after 10:30 p.m. on December 23, 2008, and arose the next morning around 9:00 a.m. (*Id.* at 291-92). Walton then went four-wheeling for approximately thirty minutes until he ran into some friends, including Barrett, and stopped to talk with them. (*Id.* at 292). Thereafter, Walton continued four-wheeling until he took a break to speak with his father's friend, Troll. (*Id.* at 292-93). Troll warned Walton to be careful on the four-wheeler because someone had just robbed "the dollar store." (*Id.* at 293). Later that day, Walton came across Chief Deputy Canterbury and another officer, M.A. Shropshire, who asked Walton if he would provide a statement about the robbery. (*Id.*) Walton declined at that point, returned home, and his mother "braided [his] hair so [he] could go talk to" the police. (*Id.*) Walton subsequently visited the Mount Hope Police Station and provided a statement to officers there. (*Id.* at 293-94). Walton informed the officers that he was left-handed, weighed 170 pounds, and had been wearing a black jacket, brown hoodie, grey sweatpants, and gloves (one brown, one black) while he was four-wheeling on the day of the robbery. (*Id.* at 293-94, 304). When giving his statement, Walton offered the clothes he was wearing that day to the officers for forensic testing, but to his knowledge, the officers never collected them. (*Id.* at 294, 296). At the police station, Walton also permitted a detective to test him for the presence of pepper spray residue.

The detective who performed the residue test, Jim Sizemore, testified at trial that he first examined the pepper spray can that was found at the scene of the crime. (*Id.* at 128-29). Sizemore explained that pepper spray containers have a marking dye within them that is "invisible to the naked eye but can be seen under an alternate light source." (*Id.* at 128). Although the label on Ms. Castanon's pepper spray can did not expressly

identify a marking dye, when Sizemore exposed the can to an alternate light source ("a wave length of 415 nanometers"), he observed a bright green fluorescence on the can. (*Id.* at 129). Sizemore opined that a marking dye within the can caused the fluorescence. (*Id.* at 129-30). Approximately three or four hours after the robbery, Sizemore, Chief Deputy Canterbury, and Walton entered a darkened closet together, and Sizemore exposed Walton's face to the same wave length of light. (*Id.* at 131-32). Sizemore observed on Walton's face "[t]he same bright green fluorescence that [he] had observed on the can." (*Id.* at 131). He attempted to photograph this, but did not possess the technology to adequately do so. (*Id.* at 133, 136). On cross-examination, Sizemore testified that the alternative light source test does not allow the administrator to detect the specific make-up of the chemical that is being observed. (*Id.* at 146-47).

After performing the alternative light source test, Sizemore took swabs of certain areas on Walton's face. (*Id.* at 139). Those swabs were tested by a forensic scientist, Elana Foster, for the presence of pepper spray. (*Id.* at 275, 277). In order to conduct the test, Ms. Foster obtained a comparison sample of pepper spray from the same manufacturer who made the spray used by Ms. Castanon. (*Id.* at 280-81). Using gas chromatography-mass spectrometry, Ms. Foster concluded that pepper spray was not present on Walton's facial swabs. (*Id.* at 278, 280). When asked, Ms. Foster testified that at least one other substance, gun powder, could fluoresce during an alternative light source test. (*Id.* at 286).

In the end, the jury rejected Walton's alibi defense and convicted him on both counts. (*Id.* at 384). On January 28, 2010, the trial court sentenced Walton to fifty years' imprisonment for the first-degree robbery conviction and an indeterminate period of two to ten years' imprisonment for the assault during the commission of a felony, with both

6

sentences to be served consecutively. (ECF No. 13-3 at 4-5). On March 26, 2010, Walton filed a Motion for Reconsideration of Sentence pursuant to West Virginia Rule of Criminal Procedure 35(b), which the trial court denied four days later. (ECF No. 21-1 at 2; ECF No. 21-2 at 2). On June 14, 2010, Walton appealed his convictions and sentence to the Supreme Court of Appeals of West Virginia ("WVSCA"). (ECF No. 13-4 at 2-13). Walton argued that the trial court erred when, after receiving a note from the bailiff during deliberations indicating that a juror had reported she knew "the family" and was afraid of repercussions from "the family," it instructed the jury on the law prohibiting intimidation and retaliation against jurors and witnesses. (*Id.* at 8-9). The WVSCA refused Walton's appeal on September 22, 2010. (ECF No. 13-5 at 2).

On August 17, 2011, Walton filed a Motion for Reduction or Modification of Sentence, which he labeled as a motion pursuant to West Virginia Rule of Criminal Procedure 35(a). (ECF No. 21-3 at 2). In that motion, Walton requested that the trial court "reduce the harsh sentences imposed" by the court. (*Id.*) Walton insisted that his sentence was excessive and that he had been "sufficiently punished for a crime that [he] did not commit." (*Id.*) He also wrote that he had completed GED classes, and maintained excellent conduct while avoiding any write-ups in prison. (*Id.* at 2-3). In his request for relief, Walton again asserted that he was innocent of the crimes with which he was charged. (*Id.* at 3). As an alternative to his prison sentence, Walton requested that the court "sentence [him] to the army," place him on house arrest or probation, allow him to take the "original plea" deal in his case of ten years' imprisonment, allow him to perform community service, release him from prison based on time served, or "drop" the charges against him. (*Id.*) The docket sheet for Walton's case (Case No. 09-F-92) reflects that the trial court never issued an order on Walton's August 2011 motion. (ECF No. 15-1 at 7).

On June 18, 2012, Walton filed a state habeas petition in the WVSCA. (ECF No. 13-6 at 2). On September 20, 2012, the WVSCA refused the petition without prejudice to Walton re-filing the petition in state circuit court. (*Id.*) On October 29, 2012, Walton filed a state habeas petition in state circuit court. (ECF No. 13 at 7). The state circuit court held an omnibus habeas corpus evidentiary hearing on the petition in June 2013. (ECF No. 13-9 at 2). On February 3, 2014, the court denied Walton's state habeas petition in a lengthy opinion. (ECF No. 13 at 2). Walton appealed the circuit court's decision to the WVSCA, which denied Walton's appeal in a memorandum decision on February 9, 2015. (ECF No. 13-8 at 2-3). The WVSCA issued its mandate in the case on March 11, 2015. (*Id.* at 5).

Walton filed the instant § 2254 petition, along with a motion for appointment of counsel and evidentiary hearing, in this Court on July 22, 2015. (ECF Nos. 1 & 2). In his petition, Walton alleges seven grounds for relief: (1) actual innocence; (2) ineffective assistance of trial counsel; (3) denial of a fair and impartial jury; (4) "violation of rights when [the] state use[d] the photo lineup to identify [Walton]"; (5) improper jury instruction; (6) denial of the right to a jury of one's peers; and (7) ineffective assistance of appellate counsel. (ECF No. 1 at 5-16). With respect to his actual innocence claim, Walton insists that Ms. Castanon was mistaken when she identified him as the perpetrator. (ECF No. 1-1 at 2-3). Walton points out that Ms. Castanon first described her attacker as "very very black" to the 911 operator, but later told law enforcement officers that the attacker was "light skinned." (*Id.* at 2). Walton also argues that Ms. Castanon's first statement to a law enforcement officer after the robbery indicated the assailant was between six feet two inches and six feet four inches tall while a statement in the police report attributed to Ms. Castanon describes the robber's height as six feet. (*Id.*) Walton asserts that he is not "very very black," "light skinned," or six feet two inches to six feet four inches tall. (*Id.* at

3). Furthermore, Walton contends that the police "botched" their investigation of the crime by failing to test the blood found at the scene of the crime against Walton's blood and neglecting to compare the purported shoe print in the blood to Walton's shoe size. (*Id.* at 5). Additionally, Walton emphasizes Ms. Foster's trial testimony that the swabs taken from his face were negative for pepper spray. (*Id.* at 8). In both his actual innocence and ineffective assistance of trial counsel arguments, Walton faults his trial counsel and the trial court for permitting the results of the photographic lineup to be introduced through Chief Deputy Canterbury, who did not perform the lineup. (*Id.* at 6-7, 16). Walton also contends that his trial counsel failed to adequately impeach Ms. Castanon's credibility using her differing descriptions of the robber. (*Id.* at 3-4). Moreover, Walton argues that his counsel neglected to present evidence that the green spots that were apparent during the alternative light source testing "could have been from a million different things," including saliva. (*Id.* at 8).

On August 7, 2015, the undersigned ordered Respondent to answer the petition. (ECF No. 8). On October 2, 2015, Respondent filed an answer, (ECF No. 10), and a Motion to Dismiss the Petition as Untimely, (ECF No. 11). On October 15, 2015, the undersigned entered an order permitting Walton sixty days to respond to Respondent's motion to dismiss. (ECF No. 14). Walton filed a response to the motion to dismiss arguing that his August 17, 2011 motion filed pursuant to West Virginia Rule of Criminal Procedure 35(a) in state circuit court tolled the AEDPA's statute of limitations to the present date because the state court still has yet to rule on the motion. (ECF No. 15 at 2). In the alternative, Walton argues that his petition is based on "newly presented evidence" establishing his actual innocence, and therefore, the AEDPA's statute of limitations should be excused in this case. (*Id.* at 3-12).

On November 12, 2015, Walton filed a Motion for Partial Summary Judgment, wherein he moves for summary judgment on the ineffective assistance of trial counsel claim contained in his petition. (ECF No. 16 at 1). Walton argues that his trial counsel was ineffective in a variety of ways, including declining to object to or strike jurors that knew judicial or law enforcement officers; failing to sufficiently impeach Ms. Castanon's identification testimony; neglecting to object to the introduction of the photographic lineup; failing to seek a continuance of the trial due to Ms. Fraley's illness and Ms. Kearney's inexperience; failing to investigate the blood and footprint evidence left at the crime scene; failing to object to Sizemore's testimony concerning the alternative light source testing as improper expert opinion testimony; declining to cross-examine Ms. Castanon's husband and object to his hearsay testimony; and failing to request that the trial court individually question the jury concerning the juror's note that she was afraid of repercussions from "the family." (*Id.* at 2-16). For relief, Walton requests that the Court "reverse" his conviction and order the state court to retry him within sixty days or release him from custody. (*Id.* at 16).

On December 9, 2015, the undersigned issued a memorandum opinion and order denying Walton's motion for appointment of counsel and denying, without prejudice, Walton's motion for an evidentiary hearing. (ECF No. 19). That same day, the undersigned ordered further briefing on the timeliness of Walton's petition. (ECF No. 20). Specifically, the undersigned directed Respondent to address Walton's position that his petition is timely as a result of the state circuit court's declination to address his Rule 35(a) motion. (*Id.* at 2). Additionally, the undersigned ordered Respondent to answer the merits of grounds two, three, four, five, and six contained in Respondent's § 2254 petition.

On December 17, 2015, Respondent filed a response to the undersigned's order.

(ECF No. 21). Therein, Respondent argues that Walton's August 2011 motion should be characterized as a motion filed pursuant to West Virginia Rule of Criminal Procedure 35(b), not Rule 35(a). (*Id.* at 6-9). In support of this position, Respondent explains that a Rule 35(a) motion, which may be properly filed at any time, is the proper procedural vehicle to challenge an illegal sentence, whereas a Rule 35(b) motion, which must be filed within 120 days of the imposition of sentence or the WVSCA's entry of a mandate following an appeal, is appropriately used to seek a sentence reduction. (*Id.* at 4-5). Respondent contends that the title of Walton's August 2011 motion, along with its substance, indicate that Walton's motion was filed pursuant to Rule 35(b). (*Id.* at 8). Respondent points out that Walton's motion requests that the trial court reduce his sentence, and Walton provides a number of factors that he believes support his request for a sentence reduction as well as multiple "alternative sentences" that the trial court should consider. (*Id.*) Additionally, Respondent's counsel notes that he contacted the trial court judge's law clerk, who informed counsel that it is not the trial court judge's policy to issue rulings on successive Rule 35(b) motions. (*Id.* at 2 n.1). According to Respondent's counsel, because the trial court denied Walton's March 2010 Rule 35(b) motion, the court did not issue a ruling on the August 2011 motion. (*Id.*) Ultimately, Respondent avers that Walton's August 2011 motion is properly construed as a Rule 35(b) motion and that the motion did not toll the AEDPA's statute of limitations because it was untimely filed in state court. (*Id.* at 3-6, 9).

Walton subsequently filed a response memorandum addressing Respondent's timeliness argument and a Motion for Post-Conviction Bond. (ECF Nos. 22 & 23). Walton maintains that his August 2011 motion was filed pursuant to Rule 35(a), and he provides several reasons in support of this contention. First, Walton points out that he cited Rule

35(a) in his motion. (ECF No. 22 at 3). Second, Walton asserts that his motion challenged the legality of his sentence, as evidenced by his arguments that the sentence was excessive and imposed on an innocent person. (*Id.*) Third, Walton contends that he amended the pending motion in August 2015 to add arguments concerning the legality of his sentence. (*Id.*) For instance, Walton insists in his motion to amend that he was not given credit for fifty-three days that he spent in jail prior to sentencing and that errors in the indictment resulted in an illegal sentence. (*Id.*) Accordingly, Walton argues that his August 2011 motion was timely under Rule 35(a), and therefore, the motion tolled the AEDPA's statute of limitations. (*Id.* at 6). Furthermore, Walton asserts that the Court could construe his August 2011 motion as a state habeas petition, which Walton alleges would have also been timely and tolled the AEDPA's statute of limitations. (*Id.* at 5-6).

## II.  <u>Standard of Review</u>

Respondent filed a motion to dismiss ostensibly under Federal Rule of Civil Procedure 12(b)(6), based on Petitioner's failure to timely file his petition. (ECF No. 11). Because Respondent filed an answer concurrently with his motion to dismiss, the motion technically should be considered as one for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *Walker v. Kelly*, 589 F.3d 127, 139 (4th Cir. 2009). However, the distinction makes no practical difference as the same standard of review applies to motions to dismiss under Rule 12(b)(6) and motions for judgment on the pleadings under Rule 12(c), and both motions may be filed in § 2254 actions. *Id.* at 138-39.

When deciding a motion for judgment on the pleadings, the court must accept all well-pleaded allegations of the petition as true and "draw all reasonable factual inferences" in favor of the petitioner. *See Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir.

2014); *Wolfe v. Johnson*, 565 F.3d 140, 169 (4th Cir. 2009). Nevertheless, the court is "not obliged to accept allegations that 'represent unwarranted inferences, unreasonable conclusions, or arguments,' or that 'contradict matters properly subject to judicial notice or by exhibit.'" *Massey*, 759 F.3d at 353 (quoting *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006)). A court presented with a motion for judgment on the pleadings in a § 2254 case must consider "the face of the petition and any attached exhibits." *Walker*, 589 F.3d at 139 (quoting *Wolfe*, 565 F.3d at 169) (internal markings omitted). In addition, the court may consider "matters of public record," including documents from prior or pending court proceedings, when resolving the motion without converting it into a motion for summary judgment. *Id.*

On the other side, Walton has moved for partial summary judgment. (ECF No. 16). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). However, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). In addition, only genuine disputes over material facts "will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Motions for summary judgment impose a heavy burden on the moving party as it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990). Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50).

### III.   Discussion

The AEDPA contains a one-year statute of limitations within which a state prisoner may file a federal habeas corpus petition. 28 U.S.C. § 2244(d)(1). The one-year limitation period begins to run from the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id.* Section 2244(d)(2) clarifies that the running of the one-year period is suspended for any time that a "properly filed" state post-conviction proceeding "is pending." *Id.* § 2244(d)(2). The Fourth Circuit has construed a state post-conviction proceeding to include all state court proceedings "from initial filing [in the trial court] to final disposition by the highest state court." *Taylor v. Lee,* 186 F.3d 557, 561 (4th Cir. 1999). Upon final disposition of the state post-conviction proceeding, "the running of the § 2244(d) one-year period resumes." *Harris v. Hutchinson*, 209 F.3d 325, 327 (4th Cir. 2000). In other words, the one-year period begins at the conclusion of direct review, but is statutorily tolled if collateral proceedings are initiated in state court. Once collateral state court proceedings conclude, the limitation period begins to run again from the point at which it was tolled by initiation of the collateral proceedings.

In this case, Walton does not claim that an impediment created by State action prevented him from filing a § 2254 petition, or that a newly recognized constitutional right retroactively applies to his habeas claims. Accordingly, neither § 2244(d)(1)(B), nor § 2244(d)(1)(C) are relevant to the timeliness issue. Likewise, Walton does not allege that any of his claims are based on a factual predicate that was discovered at a date later than

when Walton's conviction and sentence became final by the conclusion of direct review. Indeed, Walton's claims rely on facts that existed at the time of his trial and direct appeal, and Walton either knew of those facts, or could have discovered those facts through the exercise of due diligence, prior to the date on which the judgment in his criminal case became final after his unsuccessful direct appeal to the WVSCA. While Walton bolsters his actual innocence and ineffective assistance of counsel claims by citing to testimony at the state habeas evidentiary hearing, it is clear that Walton knew, or should have known, of the facts underlying his actual innocence claim and counsel's allegedly deficient performance at the time of trial and his direct appeal. Consequently, § 2244(d)(1)(D) does not apply to any of Walton's claims.

That leaves § 2244(d)(1)(A), which provides that the limitations period for a § 2254 petition begins running "on the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." Here, Walton's direct appeal was denied by the WVSCA on September 22, 2010. (ECF No. 13-5 at 2). Walton then had ninety days in which to seek a writ of certiorari from the United States Supreme Court. Sup. Ct. R. 13(1). Walton did not seek such a writ, and thus, one day after the ninety days had passed, on December 22, 2010, Walton's judgment became final, and the AEDPA's one-year statute of limitations began to run.[2]

Walton contends that the statute of limitations was then tolled when he filed his August 2011 motion because the motion constituted "a properly filed application for state post-conviction or other collateral review." 28 U.S.C. § 2244(d)(2). In response to Respondent's argument that the motion was not "properly filed," and therefore did not

---

[2] Under Federal Rule of Civil Procedure 6(a), the one-year limitation period commences the day after the event triggering the period. *See Hernandez v. Caldwell*, 225 F.3d 435, 439 (4th Cir. 2000).

toll the limitations period, Walton insists that the motion was timely because it was filed under Rule 35(a), which allows a motion to correct an illegal sentence to be filed at any time. If Walton's August 2011 motion were construed as a Rule 35(a) motion, then the AEDPA's statute of limitations would be tolled while the motion is pending, making the instant § 2254 petition timely as the state circuit court has not issued a decision on the motion. However, the undersigned concludes that the motion was properly characterized as a motion for reduction of sentence pursuant to Rule 35(b) by the state circuit court, and thus, the motion was required to be filed within "within 120 days after the entry of a mandate by the [WVSCA] upon affirmance of a judgment of a conviction or ... the entry of an order by the [WVSCA] dismissing or rejecting a petition for appeal of a judgment of a conviction or probation revocation." *See* W. Va. R. Crim. P. 35(b); (ECF No. 21 at 2 n.1).

The title and contents of Walton's August 2011 motion demonstrate that he was seeking a reduction of his sentences under Rule 35(b). First, Walton titled his motion as one for a "reduction or modification of sentences." (ECF No. 21-3 at 2). Second, Walton requested in the opening paragraph of his motion that the state court "reduce the harsh sentences" imposed upon him. (*Id.*) Third, Walton laid out multiple post-conviction factors that he believed supported a reduction of sentence, including his behavior in prison. (*Id.* at 2-3). Additionally, Walton proposed several other possible sentences to which the court could sentence him. (*Id.* at 3). While Walton points out that his August 2011 motion specifically cites Rule 35(a), his citation of that subsection is not controlling, *see United States v. Winestock*, 340 F.3d 200, 203 (4th Cir. 2003), and the substance of the motion belies Walton's attempt to invoke the timing language contained in Rule 35(a). Furthermore, Walton's contention that his claim of innocence in the motion transforms it into a Rule 35(a) motion is unconvincing. The WVSCA has recognized that Rule 35(a)

motions are meant to challenge sentences, not underlying convictions. *State v. Pethel*, No. 12-0838, 2013 WL 3242792, at *1-*2 (W. Va. June 28, 2013); *Layne v. Siefert*, No. 10-1278, 2012 WL 2874240, at *1 (W. Va. Jan. 13, 2012); *cf. United States v. Little*, 392 F.3d 677-78 (4th Cir. 2004) (explaining that under former version of Federal Rule of Criminal Procedure 35(a), which permitted motion to correct illegal sentence to be brought at any time, underlying conviction could not be challenged by movant). Indeed, the cases cited by Walton support this notion. *See* (ECF No. 22 at 3-4) (citing cases where Rule 35(a) motions were used to challenge legality of *sentences*). In addition, a claim of innocence is not inconsistent with a request for sentence reduction; in fact, Walton used his plea of innocence to support his request for a reduced or modified sentence. Moreover, the undersigned rejects Walton's argument that his August 2015 attempt to amend the August 2011 motion saves the motion from being construed as a Rule 35(b) motion. A petitioner may not amend a state post-conviction motion four years after the motion was originally filed to completely alter the claims contained therein with the aim of tolling the AEDPA's limitations period. Finally, the undersigned declines Walton's invitation to construe his August 2011 motion as a state habeas petition because he has not offered any cogent reason for doing so. To be sure, the state trial court declined to characterize the motion as a state habeas petition, likely due to Walton's overarching goal of sentence leniency or reduction within the motion and Walton's choice not to mention habeas relief or the state habeas statute in document.

In sum, although a post-conviction motion under Rule 35 could contain claims under both subsections of the rule, which would create different time limitations for each claim, in Walton's case, his August 2011 motion is properly characterized as a motion for reduction of sentence pursuant to Rule 35(b). Walton did not file his August 17, 2011

motion until nearly one year after the WVSCA denied his petition for appeal on September 22, 2010. Clearly, Walton's August 2011 motion was untimely under Rule 35(b), which requires a motion under that subsection to be filed "within 120 days after ... the entry of an order by the supreme court of appeals dismissing or rejecting a petition for appeal of a judgment of a conviction or probation revocation." While a motion to reduce sentence may toll the AEDPA's statute of limitations from running, an untimely motion does not since it is not "properly filed" within the meaning of § 2244(d)(2). *See Wall v. Kholi*, 562 U.S. 545, 131 S.Ct. 1278, 1281-82, 179 L.Ed.2d 252 (2011) (holding motion to reduce sentence may toll AEDPA's statute of limitations); *Pace v. DiGuglielmo*, 544 U.S. 408, 414-17, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) (recognizing that untimely state postconviction petition does not toll AEDPA's statute of limitations). Accordingly, Walton's August 2011 motion did not toll the AEDPA's limitations period.

As mentioned above, the limitations period for Walton's § 2254 petition began to run on December 22, 2010. As Walton's August 2011 motion did not prevent the statute of limitations from continuing to run, the next potential tolling event occurred on June 18, 2012, when Walton filed a state habeas petition under the original jurisdiction of the WVSCA. However, that state habeas petition was not filed until nearly eighteen months after the statute of limitations started running for Walton's § 2254 petition. Thus, under § 2244(d)(1)(A), the limitations period expired on December 22, 2011, before Walton filed his original jurisdiction habeas petition in the WVSCA and well before Walton filed the instant § 2254 petition on July 22, 2015. Accordingly, the undersigned **FINDS** that Walton's § 2254 petition is untimely under § 2244(d)(1)(A).

However, that finding is not the end of the matter. Walton asserts that his untimeliness should be excused in light of the evidence of his actual innocence. In

19

*McQuiggin v. Perkins*, ____ U.S. ____, 133 S.Ct. 1924, 1933-35, 185 L.Ed.2d 1019 (2013), the Supreme Court held that 28 U.S.C. § 2244(d)(1)(D) did not preclude a federal court from "entertaining an untimely first federal habeas [§ 2254] petition raising a convincing claim of actual innocence." To demonstrate a miscarriage of justice sufficient to excuse his untimeliness, Walton must show actual innocence based on "new reliable evidence." *See Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Teleguz v. Zook*, 806 F.3d 803, 808 (4th Cir. 2015). More specifically, Walton "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *McQuiggin*, 133 S.Ct. at 1935 (quoting *Schlup*, 513 U.S. at 327). As the parties do in this case, federal courts of appeals have disagreed on the meaning of "new" within the "new reliable evidence" language of *Schlup. See Kidd v. Norman*, 651 F.3d 947, 952 (8th Cir. 2011) (discussing circuit split). The Supreme Court did very briefly elaborate on the meaning of "new reliable evidence" in *Schlup* when the Court explained that "[t]o be credible, ... [an actual innocence] claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." 513 U.S. at 324. Nevertheless, "[t]he Seventh and Ninth Circuits have interpreted this phrase to mean evidence is 'new' for purposes of a Schlup analysis so long as it was 'not presented' at trial," whereas, "the Third Circuit agrees with [the Eighth Circuit] that evidence is 'new' only if it was not available at the time of trial through the exercise of due diligence." *Kidd*, 651 F.3d at 952. The Fourth Circuit has yet to definitively stake its position on the meaning of the term "new" evidence in the actual innocence context, although at least three district courts within the Fourth Circuit have interpreted the term "new" to require newly discovered evidence. *See Graham v. Warden, Wallens*

*Ridge State Prison*, No. 1:14cv922, 2016 WL 183541, at *2 (E.D. Va. Jan. 13, 2016); *Bolt v. United States*, No. 6:08-cr-00213-GRA, 2014 WL 1094382, at *3 (D.S.C. Mar. 17, 2014); *United States v. Barajas*, No. 5:13CV80574, 2013 WL 5720339, at *1 (W.D. Va. Oct. 18, 2013).

Under either interpretation of "new," however, when deciding a petitioner's gateway innocence claim under *Schlup* and *McQuiggin*, the court "must consider 'all the evidence' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House v. Bell*, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) (quoting *Schlup*, 513 U.S. at 327-28). Further, in assessing the new evidence presented, a habeas court may consider how the "timing of the submission" of the evidence and "the likely credibility" of the source of the evidence bears on the reliability of that evidence. *Schlup*, 513 U.S. at 332; *see also McQuiggin*, 133 S. Ct. at 1935 (recognizing that "unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing").

Assuming *arguendo* that Walton's interpretation of "new" evidence is correct (i.e. the evidence need only be newly presented, not newly discovered), he still fails to meet the "demanding" standard set out in *Schlup* and followed by the Court in *McQuiggin*. *See Teleguz*, 806 F.3d at 809. Although the evidence of Walton's guilt in this case may not be overwhelming, he certainly has not demonstrated that "it is more likely than not that no reasonable juror would have convicted him in the light" of the "new" evidence discussed in his memoranda.

Walton's purportedly "new" evidence includes the 911 recording wherein Ms. Castanon provided a description of her attacker as "very very black" and Ms. Castanon's

later description to law enforcement that the robber was light complected, as reflected in a press release by the Fayette County Sheriff's Office. (ECF No. 15 at 4; ECF No. 16-1 at 10). Walton also emphasizes the two to three inch discrepancy in Ms. Castanon's description of the suspect's height when her written statement to police is compared with the Sheriff's Office press release. (ECF No. 15 at 4). At trial, Walton's counsel attempted to impeach Ms. Castanon's identification by questioning her about the description she provided to a 911 operator. (ECF No. 13-1 at 184-85). Ms. Castanon testified that she did not remember telling the 911 operator that her attacker was "very very black," but conceded that, if the 911 recording contained that description, then she would not dispute it. (*Id.* at 185). Walton faults his counsel for not later introducing the 911 recording into evidence; however, Walton fails to appreciate the potential negative impact of the jury listening to a 911 recording of the victim during an undoubtedly frantic situation. Moreover, counsel at least presented the 911 tape's description of the assailant's complexion through her questioning of Ms. Castanon. Additionally, the jury was made aware during Chief Deputy Canterbury's testimony that Ms. Castanon had described the robber as six feet one inch tall and light complected. (*Id.* at 94). Accordingly, given the evidence adduced at trial, this "new" evidence may not be newly presented at all; rather, it appears to be duplicitous of the testimony heard by the jury.[3] Nonetheless, even accepting this evidence as "new," considering that Ms. Castanon identified Walton as her attacker during a photographic lineup, which the state circuit court concluded was "not suggestive" and was created consistent with state statutory "suggestions" for photographic lineups, the undersigned cannot conclude that further impeachment

---

[3] During closing argument, Walton's trial counsel stressed the "varying descriptions" of the perpetrator's skin color and clothing provided by Ms. Castanon. (ECF No. 13-1 at 353).

evidence of Ms. Castanon's descriptions of her assailant makes "it is more likely than not that no reasonable juror would have convicted him." (ECF No. 3 at 27-28). Similarly, Ms. Castanon identified Walton as the robber in open court during trial, which further undercuts his actual innocence argument.[4] (ECF No. 13-1 at 178).

Walton also argues that other evidence never presented to the jury helps him meet the rigorous *Schlup* standard. For instance, Walton asserts that there was "exculpatory" evidence at the crime scene that was never tested, including blood and a possible shoe print. (ECF No. 15 at 6). However, Walton has not presented to this Court any expert analysis of this evidence that would exculpate him. Moreover, by omission at trial, the jury was aware that this evidence was not tested by law enforcement, and no link between Walton and the blood or potential shoe print was presented to the jury. Walton's claim that the physical evidence at the crime scene exonerates him, by itself, is insufficient to meet the *Schlup* standard.

Likewise, Walton's claim that a jury would not have convicted him had they known that the green spots on his face during the alternate light source testing could have resulted from a number of other substances, including saliva, is unconvincing. Walton's trial counsel did argue in closing that "all sorts of substances produce different types of reactions under" alternate light sources, citing Ms. Foster's testimony that gun powder may fluoresce during alternate light source testing and an officer's testimony that an alternate light source test could identify the presence of semen. (ECF No. 13-1 at 356). However, Walton has failed to come forward with record support for his contention that the *same* bright green spots could be produced by multiple other substances under the

---

[4] Walton's left-handedness and his description of the clothing that he was wearing on the day of the robbery also lend some support to Ms. Castanon's identification.

same testing conditions. Moreover, the jury was made aware that that the alternative light source test does not allow the administrator to detect the specific make-up of the chemical that is being observed, which goes to the heart of Walton's claim. (*Id.* at 146-47).

Finally, Walton asserts that his counsel failed to subpoena three alibi witnesses for trial. (ECF No. 15 at 11-12). Nonetheless, Walton has not provided the names of these witnesses or described the substance of their testimony and how it would have differed from the testimony provided by the alibi witnesses called by defense counsel at trial. As such, Walton's argument fails for lack of detail and lack of proof.

In sum, the "new" evidence argued by Walton is insufficient to leap *Schlup's* extraordinarily high hurdle. Ms. Castanon identified Walton as her attacker during a photographic lineup and at trial, and Walton professed his innocence through an alibi defense. The jury credited Ms. Castanon's testimony and rejected Walton's alibi. The undersigned finds no obvious reason to conclude that Ms. Castanon was mistaken. Considering all of the evidence, Walton has failed to show that "it is more likely than not that no reasonable juror would have convicted him" in light of the "new" evidence he describes in his memoranda. *McQuiggin*, 133 S.Ct. at 1935 (quoting *Schlup*, 513 U.S. at 327). Because Walton's § 2254 petition is untimely under § 2244(d)(1)(A), and he cannot meet the timeliness exception set forth in *McQuiggin*, the undersigned **RECOMMENDS** that the presiding District Judge **GRANT** Respondent's Motion to Dismiss the Petition as Untimely, **DENY** Walton's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, and **DISMISS** this case from the docket of the Court. In addition, the undersigned **RECOMMENDS** that Walton's Motion for Partial Summary Judgment be **DENIED**, because it reiterates arguments for relief contained in his § 2254 petition and the petition is untimely. Finally, the undersigned **RECOMMENDS** that Walton's Motion

for Post-Conviction Bond be **DENIED** as he has not demonstrated the appropriateness of granting him bond, and given the undersigned's finding that his § 2254 petition is untimely, he may have no pending post-conviction matter pending in this Court.

## IV.   <u>Proposal and Recommendations</u>

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** as follows**:**

1.   Petitioner's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 1), be **DENIED** and **DISMISSED, with prejudice**;

2.   Respondent's Motion to Dismiss the Petition as Untimely, (ECF No. 11), be **GRANTED**;

3.   Petitioner's Motion for Partial Summary Judgment, (ECF No. 16), be **DENIED**; and

4.   Petitioner's Motion for Post-Conviction Bond, (ECF No. 23), be **DENIED**.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de*

*novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Petitioner, Respondent, and counsel of record.

**FILED:**  January 25, 2016

Cheryl A. Eifert
United States Magistrate Judge