**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**TONY J. WALTON**,

      **Petitioner,**

**v.**                                **Case No.: 2:15-cv-11423**

**DAVID BALLARD, Warden,
Mount Olive Correctional Complex,**

      **Respondent.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the court are Petitioner Tony J. Walton's *pro se* Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 1), and Respondent's Motion for Summary Judgment, (ECF No. 56). This case is assigned to the Honorable Thomas E. Johnston, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

After thorough consideration of the record, the undersigned conclusively **FINDS** that (1) there are no material factual issues in dispute and (2) Petitioner is not entitled to the relief requested. Therefore, for the reasons that follow, the undersigned respectfully **RECOMMENDS** that the District Court **GRANT** Respondent's Motion for Summary Judgment; **DENY** Petitioner's Petition for a Writ of Habeas Corpus; and **DISMISS** this case from the docket of the court.

## I.    <u>Relevant Facts and Procedural History</u>

On December 11, 2009, Petitioner was convicted of one count of first-degree robbery and one count of assault during the commission of a felony following a two-day jury trial in the Circuit Court of Fayette County, West Virginia. (ECF No. 13-1 at 384). The foregoing crimes occurred on Christmas Eve, December 24, 2008, at the Family Dollar store in Mount Hope, West Virginia, when its manager, Lisa Castanon, arrived to open the store. (*Id.* at 161-66). At trial, the victim testified that she unlocked the store's door at approximately 7:30 a.m. and entered the break room to obtain the bank deposit and petty cash bag when she heard a noise coming from the back of the store. (*Id.* at 163-66). She turned to see an intruder standing in the doorway of the break room with a piece of PVC pipe in his left hand. (*Id.* at 167). The intruder struck her on the head with the pipe, and a struggle ensued over the money in the victim's possession. (*Id.* at 167-68). At some point, the intruder pushed the victim into a collection of mirrors, causing her head to break the mirrors and she fell to the floor bleeding from the "whole side of [her] face." (*Id.* at 169-70). From the floor, the victim covered her face and sprayed her attacker with pepper spray; the attacker fled the store. (*Id.* at 171).

The evidence presented at trial demonstrated that the victim was injured during the attack. (*Id.* at 170). One photograph of the floor at the site of the struggle clearly showed a bloodstain. Howard Canterbury, Chief Deputy of the Fayette County Sheriff's Department ("Chief Deputy Canterbury"), testified at trial that someone had apparently stepped in the blood on the floor, or "something ha[d] gone through" it. (*Id.* at 85).

The victim's identification of Petitioner as her assailant was a key issue in dispute at trial. Soon after the robbery, the victim described her attacker to a 911 operator as a "very very black" male and informed the operator that he was wearing brown gloves and

2

a grey hooded sweatshirt. (ECF No. 16-1 at 5-7). The victim subsequently informed Chief Deputy Canterbury that her attacker was a black male with a light complexion, who was six feet one inch tall, 170 pounds, and was wearing a "hoodie" and gloves. (ECF No. 13-1 at 94). The day of the robbery, the victim also provided a written description of her attacker wherein she stated that "he was a black man about 6'2 or 6'4, about 170-180[,] wearing a dark grey hoodie and black sweat pants." (ECF No. 16-1 at 9). Within "hours" of the robbery, the victim was shown a photographic lineup of suspects, and she identified Petitioner as the man she saw in the store; however, the law enforcement officer who performed the photographic lineup did not testify at trial. (ECF No. 13-1 at 97-98). Instead, Chief Deputy Canterbury, who discussed the results of the lineup with the officer later that day, testified (without objection) that the victim selected the photograph of Petitioner. (*Id.*) At trial, the victim again identified Petitioner as the man who attacked her. (*Id.* at 178). She also testified that her assailant's hair was partially braided. (*Id.* at 173). On cross-examination, Petitioner's counsel, Elizabeth Kearney ("trial counsel"), impeached the victim about the discrepancy between the description she provided to the 911 operator and the description she provided to Chief Deputy Canterbury. (*Id.* at 184-86). The victim responded that she did not recall the description she gave to the 911 operator, but she did not dispute that she had provided that description. (*Id.* at 185-86).

Naturally, Petitioner's whereabouts at the time of the robbery were also hotly contested. Several alibi witnesses testified on Petitioner's behalf. Petitioner's brother, Kevin Walton, recalled that on the morning of the robbery, Petitioner was at their home, where they resided with their parents, and Petitioner left sometime after 8:00 a.m. to ride Kevin's four-wheeler. (*Id.* at 211). On cross-examination, Petitioner's brother conceded that he had never told the police that Petitioner was at home on the morning of December

24, 2008. (*Id.* at 215-16). Petitioner's mother, Paula Walton, remembered that Petitioner came home around 11:00 p.m. on December 23, 2008, and he was in bed at 6:30 or 7:00 a.m. when she awoke on December 24, 2008. (*Id.* at 222, 224). Petitioner's mother remembered that Petitioner got out of bed sometime after 9:00 a.m. on December 24, 2008 and left the house. (*Id.* at 224-25). She further testified that Petitioner's hair was not in braids that morning. (*Id.* at 226). On cross-examination, Petitioner's mother admitted that she did not tell the police about her son's whereabouts when they asked her for a statement in June 2009. (*Id.* at 229-30). Petitioner's father, also named Tony J. Walton, testified that he saw Petitioner arrive home on the night of December 23, 2008, and next saw him at 8:30 or 9:00 a.m. the following morning when Petitioner left to go four wheeling. (*Id.* at 235-36). Both of Petitioner's parents, whose bedroom was across from Petitioner's bedroom, added that they did not hear Petitioner leave at any point in the night. (*Id.* at 223, 236). Petitioner's friend, Don Barrett, testified that he saw Petitioner riding a four-wheeler at approximately 9:30 a.m. on December 24, 2008. (*Id.* at 255-56). At that time, Petitioner stopped the four-wheeler to speak with Barrett and informed Barrett that he had heard about a robbery at the Family Dollar store. (*Id.* at 256).

Petitioner testified that he arrived home sometime after 10:30 p.m. on December 23, 2008, and arose the next morning around 9:00 a.m. (*Id.* at 291-92). Petitioner then went four wheeling for approximately thirty minutes until he ran into some friends, including Barrett, and stopped to talk with them. (*Id.* at 292). Thereafter, Petitioner continued four wheeling until he took a break to speak with his father's friend, "Troll." (*Id.* at 292-93). Troll warned Petitioner to be careful on the four-wheeler because someone had just robbed "the dollar store." (*Id.* at 293). Later that day, Petitioner came

across Chief Deputy Canterbury and another officer, M.A. Shropshire, who asked Petitioner if he would provide a statement about the robbery. (*Id.*) Petitioner declined at that point, returned home, and his mother "braided [his] hair so [he] could go talk to" the police. (*Id.*) Petitioner subsequently visited the Mount Hope Police Station and provided a statement to officers. (*Id.* at 293-94). Petitioner informed the officers that he was left-handed, weighed 170 pounds, and had been wearing a black jacket, brown hoodie, grey sweatpants, and gloves (one brown, one black) while he was four-wheeling on the day of the robbery. (*Id.* at 293-94, 304). When giving his statement, Petitioner offered the clothes he was wearing that day to the officers for forensic testing, but to his knowledge, the officers never collected them. (*Id.* at 294, 296). At the police station, Petitioner also permitted a detective to test him for the presence of pepper spray residue.

The detective who performed the residue test, Jim Sizemore ("Detective Sizemore"), testified at trial that he first examined the pepper spray can that was found at the scene of the crime. (*Id.* at 128-29). Detective Sizemore explained that pepper spray containers have a marking dye within them that is "invisible to the naked eye but can be seen under an alternate light source." (*Id.* at 128). Although the label on the victim's pepper spray can did not expressly identify a marking dye, when Detective Sizemore exposed the can to an alternate light source ("a wavelength of 415 nanometers"), he observed a bright green fluorescence on the can. (*Id.* at 129). Detective Sizemore opined that a marking dye within the can caused the fluorescence. (*Id.* at 129-30). Approximately three or four hours after the robbery, Detective Sizemore, Chief Deputy Canterbury, and Petitioner entered a darkened closet together and Detective Sizemore exposed Petitioner's face to the same wavelength of light. (*Id.* at 131-32). Detective Sizemore observed on Petitioner's face "[t]he same bright green fluorescence that [he] had observed

on the can." (*Id.* at 131). He attempted to photograph this, but did not possess the technology to adequately do so. (*Id.* at 133, 136). On cross-examination, Detective Sizemore testified that the alternative light source test does not allow the administrator to detect the specific make-up of the chemical that is being observed. (*Id.* at 146-47).

After performing the alternative light source test, Detective Sizemore took swabs of certain areas on Petitioner's face. (*Id.* at 139). Those swabs were tested by a forensic scientist, Elana Foster, for the presence of pepper spray. (*Id.* at 275, 277). In order to conduct the test, Ms. Foster obtained a comparison sample of pepper spray from the same manufacturer who made the spray used by the victim. (*Id.* at 280-81). Using gas chromatography-mass spectrometry, Ms. Foster concluded that pepper spray was not present on Petitioner's facial swabs. (*Id.* at 278, 280). When asked, Ms. Foster testified that at least one other substance, gunpowder, could fluoresce during an alternative light source test. (*Id.* at 286).

Ultimately, the jury rejected Petitioner's alibi defense and convicted him on both counts. (*Id.* at 384). On January 28, 2010, the trial court sentenced Petitioner to fifty years' imprisonment for the first-degree robbery conviction and an indeterminate period of two to ten years' imprisonment for the assault during the commission of a felony, with both sentences to be served consecutively. (ECF No. 13-3 at 4-5). Petitioner appealed his convictions and sentence to the Supreme Court of Appeals of West Virginia ("SCAWV"). (ECF No. 13-4 at 2-13). Petitioner argued that the trial court erred when, after receiving a note from the bailiff during deliberations indicating that a juror was afraid of repercussions from "the family," who the juror recognized in the courtroom, it instructed the jury on the law prohibiting intimidation and retaliation against jurors and witnesses. (*Id.* at 8-9). The SCAWV refused Petitioner's appeal on September 22, 2010. (ECF No. 13-

5 at 2).

On June 18, 2012, Petitioner filed a state habeas petition in the SCAWV. (ECF No. 13-6 at 2). On September 20, 2012, the SCAWV refused the petition without prejudice to Petitioner re-filing the petition in state circuit court. (*Id.*) On October 29, 2012, Petitioner filed a state habeas petition in state circuit court. (ECF No. 13 at 7). The state circuit court held an omnibus habeas corpus evidentiary hearing on the petition in June 2013 ("omnibus hearing"). (ECF No. 13-9 at 2). On February 3, 2014, the circuit court denied Petitioner's state habeas petition in a lengthy opinion. (ECF No. 13 at 2). Petitioner appealed the circuit court's decision to the SCAWV, which denied Petitioner's appeal in a memorandum decision on February 9, 2015. (ECF No. 13-8 at 2-3). The SCAWV issued its mandate in the case on March 11, 2015. (*Id.* at 5).

Petitioner filed the instant § 2254 petition on July 22, 2015. (ECF No. 1). In his petition, Petitioner alleges seven grounds for relief, which he labels as follows: (1) actual innocence; (2) ineffective assistance of trial counsel; (3) denial of a fair and impartial jury; (4) "violation of rights when [the] state use[d] the photo lineup to identify [Petitioner]"; (5) improper jury instruction; (6) denial of the right to a jury of one's peers; and (7) ineffective assistance of appellate counsel. (ECF No. 1 at 5-16). With respect to his actual innocence claim, Petitioner insists that the victim was mistaken when she identified him as the perpetrator. (ECF No. 1-1 at 2-3). Petitioner points out that the victim first described her attacker as "very very black" to the 911 operator, but later told law enforcement officers that the attacker was "light skinned." (*Id.* at 2). Petitioner also argues that the victim's first statement to a law enforcement officer after the robbery indicated the assailant was between six feet two inches and six feet four inches tall while a statement in the police report attributed to the victim describes the robber's height as six feet. (*Id.*)

Petitioner asserts that he is not "very very black," "light skinned," or six feet two inches to six feet four inches tall. (*Id.* at 3). Furthermore, Petitioner contends that the police "botched" their investigation of the crime by failing to test the blood found at the scene of the crime against Petitioner's blood and neglecting to compare the purported shoe print in the blood to Petitioner's shoe size. (*Id.* at 5). Additionally, Petitioner emphasizes Ms. Foster's trial testimony that the swabs taken from his face were negative for pepper spray. (*Id.* at 8). In both his actual innocence and ineffective assistance of trial counsel arguments, Petitioner faults his trial counsel and the trial court for permitting the results of the photographic lineup to be introduced through Chief Deputy Canterbury, who did not perform the lineup. (*Id.* at 6-7, 16). Petitioner also contends that his trial counsel failed to adequately impeach the victim's credibility using her differing descriptions of the robber. (*Id.* at 3-4). Moreover, Petitioner argues that his counsel neglected to present evidence that the green spots that were apparent during the alternative light source testing "could have been from a million different things," including saliva. (*Id.* at 8).

Respondent has moved for summary judgment on Petitioner's petition to which Petitioner has filed a response. (ECF Nos. 51, 56, 58). The time period within which Respondent could file a reply has passed; therefore, the issues have been fully briefed and are ready for resolution.

## II.    <u>**Standard of Review**</u>

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in State custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When determining the merits of a

§ 2254 petition, the district court applies the standard set forth in § 2254(d), which provides that the habeas petition of a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" is:

(1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Moreover, the factual determinations made by the state court are presumed to be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Thus, when reviewing a petition for habeas relief, the federal court uses a "highly deferential lens." *DeCastro v. Branker*, 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and independent meanings. *Williams v. Taylor*, 529 U.S. 362, 405. A state court decision warrants habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams*, 529 U.S. at 405) (internal quotations omitted). The district court may grant a habeas writ under the "unreasonable application"

clause if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular case." *Id.* at 300–01 (internal marks omitted).

Accordingly, the AEDPA limits the federal habeas court's scope of review to the reasonableness, rather than the correctness, of the state court's decision. A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must also be unreasonable." *Williams*, 529 U.S. at 365.

Here, Respondent moves for summary judgment. (ECF No. 56). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). The court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller &, Mary Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). On the other hand, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). In addition, only genuine disputes over material facts "will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Motions for summary judgment impose a heavy burden on the moving party, as it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990). Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249–50).

### III. <u>Discussion</u>

As noted above, Petitioner's § 2254 petition asserts various claims with a particular emphasis on alleged ineffectiveness of his trial counsel. (ECF No. 1-1). Each claim is considered below, in turn.

### A. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington*, 466

U.S. 668, 686 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate . . . defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor*, 535 U.S. 162, 166 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694. When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. Moreover, counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and a court should not allow hindsight to alter its review. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). In addition, trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995).

In a § 2254 proceeding, the standard of review differs somewhat from the standard used in the direct review of a *Strickland*-based challenge where the state court adjudicated the petitioner's ineffective assistance of counsel claims on the merits. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem review is doubly so." *Id.* at 105 (internal citations and quotations omitted). "'Surmounting *Strickland's* high bar is never an easy task[;]' … [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). When a state court has adjudicated an

ineffective assistance of counsel claim on the merits in summary fashion, the issue is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* It is with these standards in mind that the undersigned turns to Petitioner's following claims of ineffective assistance of counsel.

### 1. Cross Examination of Victim

Petitioner argues that his trial counsel should have introduced evidence, particularly through cross-examination of the victim, to show the jury that the victim provided varying descriptions of the man that attacked her. (ECF Nos. 1-1 at 2-4; 58 at 29-35). As noted, the victim first told the 911 operator that she was attacked by a man that was "very, very black;" the victim then signed a written statement later that day asserting that she was attacked by a "black man 6'2" or 6'4" about 170 to 180 lbs.;" and, finally, the victim gave a statement to police that was documented in the police report that she was attacked by a "light skinned black male 6'0" and weighing 170 lbs." (*Id.* at 2). Petitioner argues that if his trial counsel presented these "'incredible' statements to the jury, it is more likely than not, that no reasonable juror would have convicted" him because the "statements alone would put reasonable doubt in any reasonable juror's mind." (*Id.* at 3-4). He states that the state's case "hinged" on the victim's identification of him; therefore, if the jurors were aware of the inconsistent descriptions that she provided of her attacker, it would have changed the outcome of his trial. (ECF No. 58 at 30). However, he states that his trial counsel never confronted the victim with this evidence. (*Id.* at 35).

On habeas review, the circuit court found that the victim's descriptions provided to the 911 operator and the police did not substantially differ. (ECF No. 1-2 at 58). Nevertheless, the circuit court found that Petitioner's trial counsel subjected the victim to "considerable cross examination on the issue of inconsistencies in her descriptions of the

attacker." (*Id.* at 59). The circuit court found that trial counsel made a strategic, tactical decision to utilize a transcript of the 911 recording to refresh the victim's testimony during cross-examination as opposed to playing the victim's emotionally charged 911 call for the jury. (*Id.*). Therefore, the circuit court concluded that Petitioner's trial counsel adduced evidence of the victim's varying descriptions of her attacker and Petitioner's argument that his trial counsel was constitutionally ineffective on this ground was without merit. (*Id.* at 60).

Upon review of the trial transcript, the undersigned agrees with the circuit court that Petitioner's claim is belied by the record. Petitioner's trial counsel cross-examined the victim concerning her differing identifications of the assailant, first telling the 911 operator that she was attacked by a "very, very black man," but then describing him as a "light-skinned black man." (ECF No. 13-1 at 183-185). The victim conceded that she made such non-identical statements. (*Id.* at 184, 185). Petitioner's trial counsel also emphasized in her closing argument that the victim gave varying descriptions of her attacker and further questioned the credibility of the victim's identification of Petitioner given the fact that when the victim saw her attacker, she was in a low-lit grocery store, did not have time to "take a good look," was focused on the weapon coming toward her, and suffered a serious head wound. (ECF No. 13-1 at 352-54). Therefore, the victim's differing descriptions of her attacker, as well as other reasons to question her identification of Petitioner, was a topic that was undoubtedly thoroughly presented to the jury contrary to Petitioner's claim. To the extent that Petitioner takes issue with his trial counsel's precise method or wording in conveying this information to the jury, such a claim is simply insufficient to overcome the strong presumption that his trial counsel's conduct fell within the wide range of reasonable professional assistance and could be considered sound trial

strategy. *Strickland*, 466 U.S. at 689.

Furthermore, insofar as Petitioner challenges that fact that the 911 recording itself was not entered into evidence, the circuit court is correct that there was a clear absence of prejudice to Petitioner. As stated above, the victim conceded on the stand that she told the 911 operator that she was attacked by a "very, very black man" and then told police that he was a "light-skinned black man."  (ECF No. 13-1 at 183-85). Therefore, entering the 911 recording into evidence to prove that point would not have led to a different conclusion. Rather, it would have exposed the jurors to a frantic 911 call, which could have seriously prejudiced Petitioner. Therefore, the undersigned **FINDS** that the circuit court's decision that Petitioner's trial counsel was not constitutionally ineffective in addressing the victim's "inconsistent" identifications of Petitioner at trial was not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on this ground, and that Petitioner's request for habeas relief on this ground be **DENIED**.

### 2. Bloody Shoe Print

Petitioner next argues that his trial counsel should have performed additional investigation to have the bloody "shoe print" left at the scene tested for DNA and shoe size to show that it did not match Petitioner. (ECF Nos. 1-1 at 4-5; 58 at 24). He further contends that his trial counsel should have raised the issue that the police did not collect evidence or perform any forensic testing of the blood at the scene. (ECF Nos. 1-1 at 16, 58 at 24).

In examining this claim, the circuit court noted that Chief Deputy Canterbury testified at trial that he observed parts of a broken mirror and a bloodstain on the floor at

the scene of the crime. He identified the State's Exhibit 10 as a close up photograph depicting that bloodstain, which he stated appeared to have a "footprint ... or something" that "has gone through" it. (ECF No. 1-2 at 38). Further, the circuit court cited the victim's testimony that during the crime, she was pushed into an "end cap" of mirrors, her head broke four mirrors in the display, and she fell to the floor bleeding from the side of her face. (*Id.* at 38-39). The victim stated that State's Exhibit 10 showed her blood on the floor. (*Id.* at 39). The circuit court reviewed the State's Exhibit 10 and concluded that while the bloodstain appeared to be smeared, it did not show any identifiable footprint or mark. (*Id.* at 39). Given the fact that the victim testified that it was her blood on the floor and Chief Deputy Canterbury only stated that it appeared that *something* went through the bloodstain, the circuit court concluded that Petitioner's trial counsel was not deficient under an objective standard of reasonableness in failing to introduce evidence of blood samples or shoe size. (*Id.*).

Regarding Petitioner's claim that his trial counsel was ineffective because she failed to investigate the blood stain left on the floor for exculpatory evidence, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Yarbrough v. Johnson*, 520 F.3d 329, 337–38 (4th Cir. 2008). Petitioner's trial counsel testified at the omnibus hearing that she did not believe that any forensic evidence was collected from the bloodstain at the crime scene. (ECF No. 13-9 at 58). Therefore, it was likely impossible for her to engage an expert to test the blood for DNA to exclude Petitioner. Further, it was highly doubtful that an expert could have evaluated any marks left in the stain to compare it to Petitioner's shoe size. Chief Deputy Canterbury stated only that something appeared to have smeared the blood and surmised

16

that it was possibly a footprint.

Regardless, trial counsel's decision to not investigate the bloodstain was undoubtedly reasonable in light of the circumstances. The victim stated that the man who attacked her was wearing gloves during commission of the crime and that the bloodstain at the scene came from her head wound. (ECF No. 13-1 at 170, 173). Therefore, even if the blood evidence was available for the defense to test, there was no cause for forensic testing to prove that the blood from the scene did not match Petitioner's blood type, as the evidence indicated that it was the victim's blood on the floor, not the assailant's. Further, there is no concrete evidence that any portion of a shoe print was visible in the blood such that it could have been compared to Petitioner's and the victim's shoe sizes.[1] Pursuant to Chief Deputy Canterbury's testimony, there exists nothing more than a highly attenuated possibility that any useful evidence could have been gleaned from investigation of the bloodstain. In light of the circumstances, it was reasonable for trial counsel to choose not to proceed down this improbable path and the record does not establish any "reasonable probability" that the result of the proceeding would have been different if Petitioner's trial counsel did so. Petitioner does not allege that an investigation into the bloodstain would have garnered any evidence to exclude him, but merely argues that it may have been fruitful. Such an allegation is insufficient to sustain an ineffective assistance of counsel claim. *See, e.g., Eason v. Clarke*, No. 1:16-CV-297, 2016 WL 5898633, at *10 (E.D. Va. Oct. 6, 2016), *appeal dismissed*, No. 16-7554, 2017 WL 3669424 (4th Cir. Aug. 25, 2017) ("It is well-settled that an allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been

---

[1] Petitioner appears to discount the possibility that even if there was a footprint in the bloodstain, that it came from the victim herself as she stood up.

produced") (internal markings and citations omitted).

As to trial counsel's failure to cross-examine the state's witnesses or point to the fact that the police did not collect physical evidence or perform any forensic testing of the scene, trial counsel testified at the omnibus hearing that it was something that defense counsel should raise at trial, but she did not do so in Petitioner's case. (ECF No. 13-9 at 58). Upon review of the record, the undersigned notes that Petitioner's trial counsel did reference in her closing argument the state's lack of physical evidence against Petitioner, stating that the only evidence the state offered was the victim's identification of Petitioner as the assailant, which was questionable in light of numerous factors. (ECF No. 13-1 at 359). However, as counsel acknowledged at the omnibus hearing, she did not question the officers regarding the lack of physical evidence or delve deeply into the state's lack of physical evidence during the trial.

Petitioner's trial counsel's choice to focus on discrediting the victim's identification of Petitioner, which she contended was the state's only evidence against Petitioner, and her associated decision to forego focusing on the lack of physical evidence against him, was not objectively unreasonable under *Strickland*. Simply because Petitioner's trial counsel recognized in hindsight that she might have cross-examined the officers regarding the lack of physical evidence and forensic testing does not mean that her actions were objectively unreasonable under the circumstances at the time. *Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate

the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.") (internal citations omitted).

Further, and most importantly, there is again an absence of any "reasonable probability" that the outcome of the trial would have been different had counsel focused on the failure of the police to collect and test the blood stain from the scene because the blood was that of the victim and there was nothing more than a speculative possibility that a shoe print was distinguishable in the small blood stain on the floor. *Strickland*, 466 U.S. at 691-94 (Even if counsel's action was professionally unreasonable, it "does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment ... It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding ... The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

Therefore, the undersigned **FINDS** that the circuit court's decision that Petitioner's trial counsel was not constitutionally ineffective in not forensically investigating the physical evidence or challenging the state's failure to do so is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on this ground, and that Petitioner's request for habeas relief on this ground be **DENIED**. *See, e.g., Manns v. Clarke*, No. 7:12CV00118, 2013 WL 588229, at *7 (W.D. Va. Feb. 13, 2013) (Petitioner argued that his trial counsel was ineffective because counsel failed to argue that no physical evidence linked him to the crimes, but the district court agreed with the circuit court that it was not deficient performance nor prejudicial for trial

counsel to focus on discrediting the victims' testimony rather than argue that no physical evidence linked the petitioner to the crime, noting that counsel did not have a valid legal objection because eyewitness identification is sufficient to sustain a conviction without offending due process principles and there was no reasonable probability that an alternative argument about the absence of physical identification evidence would have resulted in a different outcome).

### 3. Photographic Line-Up

As discussed, Chief Deputy Canterbury testified at trial that another officer advised him that the victim identified Petitioner as her attacker from a photographic line-up. The photographic line-up was then admitted into evidence as the State's Exhibit 21 based upon Chief Deputy Canterbury's testimony. Petitioner argues that his trial counsel was ineffective because she did not request an *in camera* hearing to establish that the photographic line-up was prepared and conducted in accordance with West Virginia Code § 62-1E-1, *et seq.*, nor did counsel object to the photographic line-up being admitted into evidence at trial based on hearsay. (ECF No. 1-1 at 6, 15-16). Petitioner states that the officer who presented the photographic line-up to the victim never testified at trial and a proper foundation was never laid for it to be admitted into evidence. Petitioner states that the admissibility of the photographic line-up is critical given the fact that "the victim['s] testimony and identification of Petitioner from the photo line-up was the only evidence presented to the jury to connect [Petitioner] to the crime." (*Id.* at 7). In addition, Petitioner states that it was "vital" to his defense to be able to confront the officer who presented the photographic line-up to the victim for identification "so the jury could know if the victim was certain about the person she picked, or if she picked someone else prior to picking Petitioner." (ECF No. 58 at 9). Petitioner further contends that the admittance

of the photographic line-up and identification of Petitioner through hearsay testimony violated Petitioner's right to due process and confrontation. (*Id.* at 7, 30-32).

In evaluating this claim on habeas review, the circuit court discussed that the use of a photographic line-up for an out-of-court identification is governed by West Virginia Code § 62-1E-2 and associated case law. The governing law provides that at least five photographs must be used in the array, all of which must closely resemble the suspect description, but do not have characteristics or background contexts that cause them to unduly stand out. (ECF No. 1-2 at 25). The circuit court further stated that most courts conclude that a photographic line-up is not overly suggestive so long as it contains some photographs that are fairly representative of the defendant's physical features. (*Id.*). The circuit court examined the photographic line-up used in Petitioner's case and noted that the six photographs comprising the line-up were very similar in appearance and were fairly representative of Petitioner's physical features; as such, the circuit court concluded that the line-up was not suggestive and was consistent with applicable law. (*Id.* at 25-26).

Nevertheless, as to Petitioner's argument that his trial counsel could have taken actions to prevent the out-of-court identification from being admitted at trial, the circuit court applied the test established in *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972), to evaluate "whether under the 'totality of the circumstances' the identification was reliable" if the confrontation procedure was suggestive. (ECF No. 1-2 at 33-36). The circuit court considered the "*Biggers* factors," including the "opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." (*Id.*); *Biggers*, 409 U.S. at 199-200.

21

As to the first two factors, the circuit court noted the victim's testimony that her attacker came within two to three feet of her before striking her and she could clearly see his face and part of his cornrowed hairstyle. (*Id.* at 32). The circuit court concluded that the victim had more than ample opportunity to view the attacker as she was focused directly on him when he approached her with a weapon and struggled with her over the moneybags. (*Id.* at 33). As to the victim's differing descriptions of the attacker, the circuit court found that any differences between the victim's 911 call made in a moment of fear, adrenaline, and emotion and her subsequent statements were "minimal at best" and the "majority of testimony adduced at trial show[ed] no discrepancy in the description and appear[ed] to be an accurate reflection of the description given by the victim after the initial emotional flood had passed." (*Id.* at 35). Given the totality of the circumstances, the circuit court found that the descriptions provided by the victim were an accurate and consistent description of Petitioner. (*Id.*). The circuit court also cited the victim's trial testimony, which it found established that the victim exhibited a high level of certainty in identifying Petitioner from the photographic line-up and in identifying him in court as the man who attacked her. (*Id.*). Finally, the circuit court noted that the victim provided a description of her attacker to law enforcement within minutes of the robbery, identified Petitioner from a photographic line-up within hours of the crime, and also identified Petitioner in trial less than a year later. (*Id.* at 35-36). Therefore, based on the totality of the circumstances and having applied the *Biggers* factors, the circuit court found that even if the photographic line-up was overly suggestive, there was not a very substantial likelihood of misidentification, and as such, the credibility of the victim's testimony was an issue properly weighed by the jury. (*Id.* at 36).

As to the admission of the photographic line-up into evidence at trial, the circuit court found that the foundation for the admission of the photographic line-up and the identification of Petitioner through the testimony of the person who prepared the photographic line-up, as opposed to the officer who conducted the actual identification, "was clearly objectionable as it was partially based upon hearsay." (*Id.* at 27). The circuit court stated that Petitioner's trial counsel could have objected at that point to the hearsay testimony and the state's foundation for entry of the photographic line-up into evidence. (*Id.*). The circuit court found that trial counsel's failure to object to the admission of the photographic line-up and out-of-court identification of Petitioner was deficient under an objective standard of reasonableness and thus met the first *Strickland* prong. (*Id.* at 28).

However, the circuit court found that there was not a reasonable probability that the result of the proceeding would have been different "but for" trial counsel's error because the officer who witnessed the victim's identification of Petitioner from the photographic line-up was present at trial and available to testify and the victim testified that the State's Exhibit 21 was the photographic line-up that she was shown and pointed to the photograph of Petitioner that she identified on that earlier date. (*Id.* at 28-31). The circuit court added that at trial the victim also pointed to Petitioner in the courtroom and identified him as the man who attacked her. (*Id.* at 30).

The undersigned agrees that Petitioner does not show that the pretrial photographic line-up procedure was unduly suggestive. "Eyewitness identification at trial following an earlier pretrial photographic identification is permissible unless the photo line-up procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *United States v. Murray*, 65 F.3d 1161, 1168 (4th Cir. 1995) (markings and citations omitted). Petitioner contends that his trial counsel

should have requested an *in camera* suppression hearing regarding the photographic line-up, but provides no basis to conclude that the photographic line-up procedure indicated a substantial likelihood of irreparable misidentification. *Id.* ("Murray points to nothing indicating the photo line-up was unduly suggestive ... Murray does not explain what so distinguishes his photograph from the others and has raised no other issue indicating a substantial likelihood of irreparable misidentification. Thus, his generalized assignment of error and lack of record support prevents us from finding any abuse of discretion by the district court.").

Petitioner references throughout his habeas petition that the victim provided inconsistent descriptions of her attacker to the 911 operator and then to law enforcement. However, the circuit court fully addressed this argument. Even though the circuit court found that the photographic line-up was not unduly suggestive, the court performed a *Biggers* analysis and one of the factors considered was the inconsistent descriptions of the attacker. *Wingfield v. Angelone*, No. 01-484-AM, 2002 WL 32595044, at *3–4 (E.D. Va. Sept. 24, 2002), *appeal dismissed*, No. 02-7730, 2003 WL 529773 (4th Cir. Feb. 26, 2003) ("In order to determine whether identification testimony is admissible, a court must engage in a two-step process. First, the court must consider whether the identification procedure is unnecessarily suggestive. A procedure is unnecessarily suggestive if a positive identification is likely to result from factors other than the witness's own recollection of the crime. Second, if the procedure was unnecessarily suggestive, a court must look at [the *Biggers* factors] to determine if the identification testimony is nevertheless reliable under the totality of the circumstances.") (markings and citations omitted).

In this case, the circuit court found that the differences in the victim's descriptions were "minimal at best" and the totality of the circumstances, including the fact that the victim testified that she had a clear view of her attacker during the commission of the robbery, the certainty that the victim displayed in identifying Petitioner from the photographic line-up and in the courtroom, and the timing of the identifications in relation to the crime, all supported the reliability of the victim's identification of Petitioner. Based on the record before the court, there is no indication that a suppression hearing was warranted regarding the photographic line-up, much less any indication that a suppression hearing would have been successful. *Wingfield,* 2002 WL 32595044, at *3– 4 (Discussing that the § 2254 petitioner failed to show that he was prejudiced by his counsel's failure to object to the witness's identification of the petitioner because the petitioner failed to show that such an objection would have been sustained).

Furthermore, as to the admission of the photographic line-up based upon hearsay, the circuit court appropriately found that Petitioner did not show that he was prejudiced by his trial counsel's failure to lodge an objection to the foundation for admission of the photographic line-up into evidence. Although the evidence was admitted based upon hearsay testimony, the victim later testified at trial that the State's Exhibit 21 was the photographic line-up that she was shown on the day of the robbery and she pointed to the photograph of Petitioner that she previously identified. (ECF No. 13-1 at 174). The victim also identified Petitioner in the courtroom as the man who attacked her. (*Id.* at 178). Therefore, a proper foundation was provided to support the admission of the photographic line-up and to support the victim's identification of Petitioner.

Therefore, for the above reasons, the undersigned **FINDS** that the circuit court's decision on Petitioner's claims related to the photographic line-up are not contrary to, or

an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on this ground, and that Petitioner's request for habeas relief on this ground be **DENIED**.

### 4. Detective Sizemore

During Petitioner's trial, Detective Sizemore testified about his training in the field of forensic alternate light source technology, which is used to detect chemical substances that may or may not be visible to the naked eye. (ECF No. 13-1 at 124-25). He stated that he completed a course through Forensic Training Services, Incorporated, in the use of forensic alternate light sources; manufacturer's training from Sirchie Fingerprint Labs, Incorporated; crime scene investigation training in connection with fluorescence and luminesce of latent fingerprints through a crime scene photography course taught by Executive Forensics; and, he also was trained in alternate light source technology through the Institute of Police Technology and Management in Jacksonville, Florida. (*Id.*). Detective Sizemore explained how alternate light source technology functions, stating that a visible spectrum of light ranges from red to ultraviolet light; together, the spectrum of light forms what is called white light. (*Id.* at 125). He stated that a forensic alternate light source instrument allows a person to shine one specific wavelength of light, which causes certain substances that cannot be seen with the naked eye to fluoresce, meaning reflect light, under that specific wavelength. (ECF No. 13-1 at 125-26). For example, Detective Sizemore stated that semen will florescence a bright white color when exposed to certain wavelengths from an alternate light source. (*Id.* at 126). Detective Sizemore further testified that what is referred to as "pepper spray" contains oleoresin capsicum ("OC"). (*Id.* at 127). Detective Sizemore testified that he examined the State's Exhibit 6, which was an empty can of pepper spray recovered from the scene of the crime. (*Id.* at 87,

129). Detective Sizemore stated that he put on latex gloves and took the empty can of pepper spray into a darkened closet at the police station and exposed it to various wavelengths of light using an alternate light source. (*Id.* at 129). He stated that at 415 nanometers, he observed a bright green fluoresce on the can that was produced by the "marking dye" component of the pepper spray that cannot be washed off like the active ingredient OC. (*Id.* at 129-32). Detective Sizemore stated that he then took Petitioner into the closet and exposed him to the same wavelength of light, he observed "the same bright green fluorescence" that he had observed on the pepper spray can. (*Id.* at 131). He stated that he attempted to photograph the fluorescence on Petitioner's skin, but was not able to capture it. (*Id.* at 132-33).

On cross-examination by Petitioner's trial counsel, Detective Sizemore stated that he also swabbed Petitioner's face with sterile moistened swabs to be tested for trace amounts of OC. (*Id.* at 139-40).   These swabs were admitted into evidence as the Defendant's Exhibit 11. (*Id.* at 142). Upon questioning by Petitioner's trial counsel, Detective Sizemore conceded that alternate light source testing does not identify what chemical is producing the fluorescence. (*Id.* at 146). Petitioner's trial counsel also called forensic scientist Ms. Foster, who provided expert testimony that she performed gas chromatography mass spectrometry testing, which did not reveal any capsaicin or pepper spray present on Defendant's Exhibit 11, the swabs of Petitioner's face. (ECF No. 13-1 at 277-80). Ms. Foster testified that the only compounds that were found on the swabs were "fatty acids," which were most likely from palm oil that could have been from the Q-tips themselves. (*Id.* at 288).

Petitioner claims that his trial counsel was ineffective because she did not object to Detective Sizemore's qualification to testify as an "expert witness." (ECF No. 1-1 at 7-9,

16). In addition, Petitioner contends that Detective Sizemore testified that the can of pepper spray did not list marking dye as an ingredient or content; nonetheless, trial counsel did not ask the manufacturer whether marking dye was included in the pepper spray, nor question Detective Sizemore as to whether he confirmed the presence of marking dye in the pepper spray. (*Id.* at 16-17). Petitioner also takes issue with the fact that his trial counsel did not offer alternative substances that could have produced the same fluorescence on Petitioner's face; such as, oily skin, soap, perfume, saliva, or gas fumes from Petitioner's four-wheeler. (*Id.* at 8, 17).

On habeas review, Petitioner's trial counsel testified that she did not consider Detective Sizemore's testimony to be expert testimony, and the circuit court agreed. (ECF No. 1-2 at 40-42). Further, the circuit court determined that considering the fact that the photographs taken by Detective Sizemore did not capture the fluorescence on Petitioner's face and Ms. Foster stated that the swabs of Petitioner's face were negative for the ingredients in pepper spray, "it was a strategic decision to elicit the testimony of [Detective] Sizemore in an attempt to lend credence to the defense's overarching theory that the police had arrested the wrong person." (*Id.* at 42). Therefore, the circuit court found that Petitioner's trial counsel's performance "cannot be said to be deficient, or outside the realm of reasonably competent assistance, under the given circumstances." (*Id.*). The circuit court added that Detective Sizemore testified at length regarding his qualifications in the use of alternate light source technology; consequently, the circuit court found that even if trial counsel had objected to Detective Sizemore's testimony, the court would likely have qualified him as an expert witness. (*Id.* at 43). As such, the circuit court found that Petitioner failed to show any reasonable probability that if his trial counsel objected to Detective Sizemore's testimony, the results of the proceeding would

have been any different. (*Id.*).

Petitioner's trial counsel testified at the omnibus hearing that it might have been prudent for her to seek a pretrial hearing in order to challenge Detective Sizemore's qualifications and testimony regarding the alternate light source testing that he performed in Petitioner's case in order to try to "trip him up" before or during trial. (ECF No. 13-9 at 51-52). Despite trial counsel's hindsight acknowledgement that it might have been useful to object to Detective Sizemore's testimony and request a pretrial hearing in order to "shake him up as a witness," the undersigned agrees with the circuit court that Petitioner's trial counsel's strategy in not objecting to Detective Sizemore's qualification to testify, but rather focusing on the lack of physical evidence to corroborate Detective Sizemore's testimony, did not fall below an objective standard of reasonableness.

Petitioner's trial counsel testified during the omnibus hearing that her strategy for Petitioner's trial, which she stated she discussed with Petitioner at length, focused on the lack of forensic evidence linking Petitioner to the crime; this included the fact that the fluorescence on Petitioner's skin did not show in the pictures and the swabs tested negative for the active ingredients of pepper spray. (*Id.* at 30). The strategy also focused on Petitioner's alibi. (*Id.*). The trial transcript clearly reflects trial counsel's strategy regarding the forensic evidence. Detective Sizemore testified at trial that he witnessed green fluorescence on Petitioner's face like the fluorescence that he saw on the can of pepper spray. However, Petitioner's trial counsel cross-examined Detective Sizemore whereupon the photographs that Detective Sizemore took of Petitioner's face, which did not capture the fluorescence, were admitted into evidence, as well as the swabs that Detective Sizemore took of Petitioner's face, were entered into evidence. (ECF No. 13-1 at 136-42). Petitioner's trial counsel then called an expert in forensic science who testified

29

that gas chromatography mass spectrometry testing did not reveal any capsaicin or pepper spray present on the swabs. (*Id.* at 277-80). Therefore, trial counsel made a strategic decision to focus the jurors' attention on the lack of physical evidence tying Petitioner to the crime. "An attorney's strategic decision is presumed reasonable and protected from second guessing under *Strickland.*" *Campbell v. United States*, No. CIVA 5:07-0120, 2009 WL 6327477, at *14 (S.D.W. Va. Nov. 6, 2009), *report and recommendation adopted,* 2010 WL 1379992 (S.D.W. Va. Mar. 31, 2010)

Moreover, even if Petitioner's trial counsel erred, Petitioner does not show any prejudice from his trial counsel's failure to object to Detective Sizemore allegedly testifying as an expert. Detective Sizemore testified extensively regarding his training in the field of alternate light source technology. Petitioner certainly does not show a "reasonable probability" that the circuit court would have found Detective Sizemore unqualified as an expert in that area, or that the circuit court would have excluded his testimony.

Petitioner makes other statements that his trial counsel should have contacted the manufacturer of the pepper spray at issue to confirm whether marking dye was included, cross-examined Detective Sizemore about whether he confirmed with the manufacturer that marking dye was included, and informed the jury that "a million things" could have caused the green fluorescence on Petitioner's face that Detective Sizemore observed, including saliva. However, to the extent that Petitioner intends to raise these specific claims of ineffective assistance of counsel, he did not make such claims in his state proceedings. Although Respondent asserted in his answer that Petitioner has properly exhausted his state court remedies for the claims raised in his § 2254 petition, (ECF No. 10 at 2), the applicability of the procedural default doctrine is readily apparent in this

case. Therefore, the undersigned, *sua sponte*, will address this issue. *See Boothe v. Ballard*, No. 2:14-CV-25165, 2016 WL 1275054, at *60 (S.D.W. Va. Mar. 31, 2016), *aff'd*, 670 F. App'x 193 (4th Cir. 2016) (adopting the undersigned's proposed findings and recommendation that certain claims made by the petitioner were procedurally defaulted and granting summary judgment to the respondent on those claims); *Roach v. Angelone*, 176 F.3d 210, 215 n.3 (4th Cir. 1999) (recognizing that court has discretion to address petitioner's procedural default *sua sponte*); *Harper v. Ballard*, No. 3:13-23467, 2014 WL 4470536, at *2 (S.D.W.Va. Sept. 10, 2014) (same); *see also Hill v. Braxton*, 277 F.3d 701, 705 (4th Cir. 2002) (stating that federal habeas court has power to raise affirmative defenses *sua sponte*).

As a prerequisite to filing a § 2254 proceeding, a habeas petitioner must exhaust his state remedies. 28 U.S.C. § 2254(b)(1)(A). Exhaustion of state remedies requires the petitioner to fairly present the federal constitutional issues to the state courts and allow them "one full opportunity" to resolve the issues. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Given that the purpose of exhaustion is to ensure that the state has "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights," *Picard*, 404 U.S. at 275 (internal quotations omitted), fair presentation demands that the state courts be fully informed of "'both the operative facts and the controlling legal principles.'" *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000) (quoting *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997)). While it is unnecessary to cite "book and verse on the federal constitution," *Picard*, 404 U.S. at 278, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (internal citations omitted). Instead, the

31

petitioner must present the "substance of a federal habeas corpus claim" to the state courts. *Picard*, 404 U.S. at 278.

In West Virginia, exhaustion is accomplished in one of three ways: by (1) presenting the federal constitutional issues directly to the SCAWV through an appeal of the conviction or sentence; (2) filing a petition for a writ of habeas corpus under the SCAWV's original jurisdiction and receiving a dismissal with prejudice; or (3) filing a petition for a writ of habeas corpus in the appropriate circuit court followed by an appeal of the judgment to the SCAWV, if the result is adverse. *Moore v. Kirby*, 879 F. Supp. 592, 593 (S.D.W.Va. 1995); *Bayerle v. Godwin*, 825 F. Supp. 113, 114-15 (N.D.W.Va. 1993); *McDaniel v. Holland*, 631 F. Supp. 1544, 1545-46 (S.D.W.Va. 1986); *see also Gardner v. Plumley*, No. 2:12-cv-03386, 2013 WL 5999041, at *5 (S.D.W.Va. Nov. 12, 2013). In general, the district court may not review a federal habeas petition unless there has been "total exhaustion" of the presented issues. *Rose v. Lundy*, 455 U.S. 509 (1982). Thus, when a petitioner has failed to exhaust his state court remedies, a federal habeas petition should be dismissed. *See Preiser v. Rodriguez*, 411 U.S. 475 (1973). In the event that a federal habeas petitioner presents a "mixed petition" consisting of both exhausted and unexhausted claims, the district court may (1) dismiss the petition in its entirety; (2) order a stay and abeyance while the petitioner exhausts his claims in state court;[2] or (3) allow the petitioner to remove the unexhausted claims and proceed with the exhausted claims.

---

[2] Stay and abeyance is only appropriate in limited circumstances in which the district court determines that "the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Rhines*, 544 U.S. at 277-78; *Wright v. Keller*, No. 3:11-cv-341-RJC, 2011 WL 5827236, at *2 (W.D.N.C. Nov. 18, 2011) (declining to order stay and abeyance); *Abido v. Ballard*, No. 2:08-cv-00341, 2009 WL 772918, at *2 n.2 (S.D.W.Va. Mar. 18, 2009) (same); *Wilson v. Humphey*, No. 5:05-cv-00795, 2006 WL 643154, at *3 (S.D.W.Va. Mar. 10, 2006) (same).

*Rhines v. Weber*, 544 U.S. 269 (2005). The court may also deny the unexhausted claims on the merits "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state." 28 U.S.C. § 2254(b)(2); *see also White v. Keller*, No. 1:10-CV-841, 2013 WL 791008, at *5 (M.D.N.C. Mar. 4, 2013).

The exhaustion barrier may only be removed when "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B). These statutory exceptions apply "only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief." *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981). Where a state court would refuse to hear a claim as a result of a petitioner's failure to observe a state procedural rule, the claim is considered to be exhausted because there is "an absence of available State corrective process." *See, e.g.*, *Rose v. Lee*, No. 7:07-cv-00003, 2007 WL 2050823, at *3 (W.D.Va. July 12, 2007) (citing *Teague v. Lane*, 489 U.S. 288 (1989)); *see also Coleman v. Thompson*, 501 U.S. 722, 732 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."); *Anderson v. Benik*, 471 F.3d 811, 814 (7th Cir. 2006) ("State remedies are exhausted when the petitioner does not have the 'right under the law of the State to raise, by any available procedure, the question presented.'") (quoting 28 U.S.C. § 2254(c)); *Villot v. Varner*, 373 F.3d 327, 337 (3d Cir. 2004) ("[W]hen the state refuses to consider the merits of the prisoner's claims because the petitioner has failed to comply with the state's procedural requirements, his claim is nonetheless technically exhausted because 'there is an absence of available State corrective process'") (quoting 28 U.S.C. § 2254(b)(1)(B)(i)). However, even though such claims are technically

exhausted, the procedural default doctrine applies to those claims in any subsequent federal habeas proceeding. *See Clagett v. Angelone*, 209 F.3d 370, 378 (4th Cir. 2000) ("If claims were not exhausted in state court but would now be procedurally barred if brought in state court, then federal courts can treat the claims as if they were procedurally defaulted in the state courts."). The procedural default doctrine prevents a court from hearing a claim that has been, or would be, disposed of on "adequate and independent state-law grounds, unless the petitioner can show cause and prejudice for, or a fundamental miscarriage of justice resulting from, failure to comply with the applicable rule." *See Bostick v. Stevenson*, 589 F.3d 160, 164 (4th Cir. 2009). "A rule is adequate if it is regularly or consistently applied by the state court … and is independent if it does not depend on a federal constitutional ruling." *Hedrick v. True*, 443 F.3d 342, 359 (4th Cir. 2006) (internal citations and markings omitted) (ellipsis in original).

With regard to the ineffective assistance of counsel claims that Petitioner failed to raise in his state proceedings, West Virginia Code § 53-4A-1(c) creates a rebuttable presumption that a state habeas petitioner knowingly and intelligently waives any claim that could have been presented during a state habeas proceeding but that was not presented at that time. This Court recently recognized that West Virginia Code § 53-4A-1(c) is "an adequate and independent state ground," for procedural default purposes. *Green v. Ballard*, No. 3:02-1348, 2015 WL 1612198, at *5 (S.D.W. Va. Apr. 10, 2015).

Petitioner raised in his state habeas proceeding his claim that his trial counsel was ineffective for not objecting to Detective Sizemore's testimony. However, Petitioner did not claim that his counsel should have performed additional investigation of the pepper spray, should have questioned Detective Sizemore about the presence of marking dye in the pepper spray, or should have offered alternative reasons for the fluorescence that

34

Detective Sizemore observed on Petitioner's face under the alternate light source. (ECF Nos. 1-2, 13-7, 13-8). Thus, the SCAWV never addressed such claims. To the extent that Petitioner may have raised the claims in an original jurisdiction petition; the SCAWV refused the petition, which would not have accomplished exhaustion. *See* (ECF No. 1-3 at 1). Consequently, the presumption that Petitioner knowingly and intelligently waived these claims applies, and the claims are procedurally defaulted unless Petitioner can establish "cause and prejudice for, or a fundamental miscarriage of justice resulting from, failure to comply with the applicable rule."[3] *See Bostick*, 589 F.3d at 164. The Fourth Circuit has explained that "[a] procedural default is excusable under the cause and prejudice standard when the petitioner demonstrates (1) that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule, and (2) that errors at his trial . . . worked to his *actual* and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Wolfe*, 565 F.3d at 158 n.27 (internal markings and citations omitted) (ellipsis and emphasis in original).

Considering Respondent's concession that all of Petitioner's grounds for habeas relief have been properly exhausted, it is not surprising that Petitioner makes no argument that one or the other exception to the procedural default doctrine applies to his claims. Nevertheless, the record does not clearly establish that Petitioner meets either exception to the procedural default doctrine.[4] Accordingly, the undersigned finds that

---

[3] The undersigned is mindful that "[i]f any reasonable possibility exists that the state court may apply an exception to its procedural default rule, the federal court should not apply a state procedural bar to find that exhaustion is futile." *Meadows v. Legursky*, 904 F.2d 903, 909 (4th Cir. 1990), *abrogated on other grounds by Trest v. Cain*, 522 U.S. 87 (1997). However, the undersigned does not find, nor does Petitioner argue, any basis to find a "reasonable possibility" that the state court would apply an exception to its procedural default rule.

[4] Of course, because this is a PF&R and not a final decision on the merits of the petition, Petitioner is free to argue to the District Court that his procedural default should be excused. *See Harper v. Ballard*, No. 3:13-23467, 2014 WL 4470536, at *2 (S.D.W.Va. Sept. 10, 2014).

Petitioner's ineffective assistance of trial counsel claims arguing that (1) his trial counsel should have contacted the manufacturer of the pepper spray used by the victim of the crime to investigate whether marking dye was included in the can, (2) cross-examined Detective Sizemore regarding whether he contacted the manufacturer to confirm that marking dye was included, and (3) offered the jurors alternative substances which could have caused the fluorescence on Petitioner's face are procedurally defaulted.

Notwithstanding the above, the undersigned will address the merits of the procedurally defaulted claims and, as an alternate finding, suggest that the District Court deny them on the merits. *See Flippo v. McBride*, 393 F. App'x 93, 97 (4th Cir. 2010) ("Although courts may reach the merits of a habeas petition to deny it, 28 U.S.C. § 2254(b)(2), they cannot issue the writ for unexhausted or procedurally defaulted claims."); *Eaton v. Angelone*, 139 F.3d 990, 994 n.1 (4th Cir. 1998) ("Because we agree with the district court's denial of [petitioner's] ineffectiveness claims on the merits, we need not resolve the thorny issue of procedural default.").

The state's witness, Detective Sizemore, testified that he performed alternate light source testing under which he saw green fluorescent spots on Petitioner's face that were consistent with the fluorescence that he observed on the can of pepper spray. Detective Sizemore stated that the fluorescence was caused by "marking dye" in the pepper spray, although there was no proof offered that the pepper spray contained marking dye and the can did not list that it included marking dye. Petitioner claims that his attorney was ineffective because she did not independently investigate whether the pepper spray contained marking dye by contacting the manufacturer and did not question Detective Sizemore whether he confirmed with the manufacturer that it contained a marking dye. Also, Petitioner contends that his trial counsel should have offered alternative substances

36

to explain the fluorescence on Petitioner's face.

Importantly, Petitioner does not argue that the pepper spray did not contain marking dye. Rather, he contends that since there was no proof that it did contain that ingredient, his counsel should have explored this possible avenue to rebut Detective Sizemore's testimony that he saw fluorescence from marking dye on Petitioner's face. Therefore, Petitioner's assertion of error is based upon nothing more than speculation "An allegation that an attorney conducted an inadequate investigation does not warrant relief absent a proffer of the specific favorable evidence the investigation would have brought out." *Campbell*, 2009 WL 6327477, at *11 (citations omitted). Further, "[t]he reasonableness of an investigation made by counsel must be evaluated under the totality of the circumstances facing the attorney" and while counsel could have made a more thorough investigation, in considering claims of ineffective assistance of counsel, the court considers "not what is prudent or appropriate, but only what is constitutionally compelled." *Id.*

Given the totality of the circumstances, it was not objectively unreasonable for Petitioner's trial counsel to forego investigating whether the pepper spray contained marking dye, as Detective Sizemore testified; questioning Detective Sizemore about whether it contained marking dye; or mentioning specific substances can also produce fluorescence. Petitioner proffers nothing to show that these tactics, as opposed to the strategy that his trial counsel employed, would have reasonably produced a different outcome. As discussed above, Petitioner's trial counsel highlighted the fact that the photographs and swabs of Petitioner's face did not show that he was sprayed with pepper spray. She also focused on the fact that the alternate light source testing does not reveal what chemical is producing the fluorescence, which cast additional doubt as to whether

the fluorescence that Detective Sizemore observed was caused by marking dye or some other substance. While Petitioner's trial counsel could have made other strategical decisions or adduced other theories to rebut Detective Sizemore's testimony, Petitioner fails in this case to show that his trial counsel's representation was objectively unreasonable, nor does he show a reasonable probability that the alternate or additional investigation and strategies that he suggests would have affected the outcome of his case.

Therefore, having thoroughly considered the matter, the undersigned **FINDS** that the circuit court's decision that Petitioner's trial counsel was not constitutionally ineffective by not objecting to Detective Sizemore's testimony was not contrary to, or an unreasonable application of, clearly established federal law. Additionally, the undersigned **FINDS** that Petitioner's additional claims that his trial counsel was ineffective because she did not perform additional investigation, cross-examination, or offer alterative theories to rebut Detective Sizemore's testimony are procedurally defaulted and to the extent that they are *not* procedurally defaulted, those claims are also without merit. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on these grounds, and that Petitioner's request for habeas relief on these grounds be **DENIED**.

### 5. Alibi Witnesses

Petitioner was convicted of robbing a Family Dollar store and assaulting the employee on duty around 7:25 a.m. on Christmas Eve, December 24, 2008.  (ECF No. 1-2 at 2). In his next allegation of ineffective assistance of trial counsel, Petitioner states that he had three alibi witnesses that were supposed to testify on his behalf and his trial counsel failed to subpoena or even interview any of them. (ECF No. 1-1 at 9). He argues that the state told the jury that the person who robbed the store entered the premises on

December 23, 2008 and hid in the store overnight until it opened on December 24, 2008.
(*Id.*). He states that if the jury heard from his three alibi witnesses, "it would have
definitely given the jurors a reasonable doubt." (*Id.*).

Like some of his claims discussed above, Petitioner did not raise this claim in his
state proceedings. Based upon the same rationale, the undersigned finds that this claim
is procedurally defaulted. Moreover, the undersigned finds that this claim is without
merit. Petitioner does not identify the names of the witnesses that he argues should have
been called, nor does he proffer any evidence of their proposed testimony. His bare
statement that his counsel failed to call three unnamed alibi witnesses is insufficient.
*Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990) (finding that a petitioner
cannot establish ineffective assistance of counsel under *Strickland* on the general claim
that additional witnesses should have been called, but must proffer evidence of what their
testimony would have been); *Slate v. Vargo*, No. 1:12-CV-1477, 2014 WL 3378627, at *7
(E.D. Va. July 8, 2014) ("In federal jurisprudence it is well established that a claim of
ineffective assistance predicated on a failure to call witnesses fails where affidavits
verifying the witnesses' testimony are not provided."); *Johnson v. McCall*, No. 2:09-1532-
P.M.D, 2010 WL 936726, at *4 (D.S.C. Mar. 15, 2010) ("[M]ere speculation what the
witnesses' testimony would have been cannot, by itself, satisfy the applicant's burden of
showing prejudice."); *United States v. Boysaw*, No. 7:03CR00128-1, 2009 WL 1797869,
at *4 (W.D. Va. June 23, 2009) ("Boysaw does not even allege who the other seven
witnesses that counsel should have subpoenaed were or what they could have testified to
and, thus, he has not shown deficient performance by counsel or prejudice as a result of
counsel not calling those seven unknown witnesses.")

Furthermore, it is unclear which witnesses Petitioner contends that his trial counsel should have called to testify because Petitioner's trial counsel indeed called several members of Petitioner's family and several of his friends who testified to Petitioner's whereabouts during the evening of December 23, 2008 and morning of December 24, 2008. In fact, Petitioner's trial counsel testified during the omnibus hearing that Petitioner's alibi was a critical focus of the trial strategy that she developed with Petitioner. (ECF No. 13-9 at 30). Leighanna Dawn Johnson testified that Petitioner was at her home playing video games with a group of friends until 9:30 or 10:00 p.m. on December 23, 2008. (ECF No. 13-1 at 201, 207). Petitioner's brother, Kevin Walton, testified that he was with his brother until 10:30 to 10:45 p.m. on December 23, 2008 after which Petitioner went home. (*Id.* at 210). Petitioner's brother stated that he then saw Petitioner at their home around 8:00 a.m. the next day, December 24, 2008, when Petitioner woke up and asked to ride his four-wheeler. (ECF No. 13-1 at 211). Petitioner's parents, Paula and Tony Jerome Walton, both testified that they saw Petitioner arrive home on the evening of December 23, 2008 and saw him leave the house to go four-wheeling around 8:30 to 9:00 a.m. the next morning, December 24, 2008. (*Id.* at 222-25, 235-37). Petitioner's parents stated that their bedroom was across the hall from Petitioner's and they slept with the door open; in addition, Petitioner's mother stated that she was a "pretty light sleeper," but neither parent heard Petitioner leave the house between the evening of December 23, 2008 and 8:30 to 9:00 a.m. on December 24, 2008. (*Id.*). Petitioner's friend, Brandon Donnell, testified that he saw Petitioner between 9:15 and 9:30 a.m. on December 24, 2008 at their mutual friend Don Barrett's house. (*Id.* at 248). Finally, another friend, Don Juan Barrett, testified that he saw Petitioner around 9:30 a.m. on December 24, 2008 when Petitioner stopped his four-wheeler to talk to him.

40

(*Id.* at 255-56). Mr. Barrett stated that he was close to Petitioner when they were talking and Petitioner's eyes were not swollen and he looked normal in appearance, except that his hair was bushy from wearing his helmet. (*Id.* at 256-57).

Therefore, for the reasons stated above, the undersigned **FINDS** that Petitioner's claim that his trial counsel was ineffective because she did not call three alibi witnesses is procedurally defaulted and to the extent that it is *not* procedurally defaulted, the claim is without merit. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on this ground, and that Petitioner's request for habeas relief on this ground be **DENIED**.

### 6. Jury Selection

Petitioner contends that his trial counsel was ineffective with respect to selecting a jury in his case. First, he contends that his trial counsel was deficient because she did not ask any follow-up questions or object to the jury panel during *voir dire*, although one of the jurors stated that his father was a county magistrate at the courthouse, another was related to a police officer, another worked with an officer that was one of the state's witnesses, and another was family friends with the prosecutor. (ECF No. 1-1 at 15, 26). Petitioner also argues that the above facts denied him his constitutional right to a fair and impartial jury. (*Id.* at 26). These claims were not presented in Petitioner's state proceedings and thus were procedurally defaulted. Moreover, they are without merit.

To begin, the potential juror that previously worked with Detective Sizemore and the potential juror whose daughter was friends with the prosecutor were not selected as jurors in Petitioner's case. (ECF No. 13-1 at 21, 24, 37, 387-88). Therefore, Petitioner cannot possibly show any prejudice from his trial counsel's failure to question, challenge, or strike these potential jurors. As to Petitioner's other claims insinuating that his trial

counsel failed to investigate or object to potential juror bias and that he was denied a fair and impartial jury, two of the jurors selected in his case each had a cousin who was a deputy sheriff and one juror's father was a county magistrate. (*Id.* at 14-17). Petitioner appears to focus primarily on the juror whose father was a county magistrate, arguing that his trial counsel should have asked if the juror's father was the magistrate that "bound Petitioner's case to the grand jury" or ever discussed the case with the juror. (ECF No. 58 at 12). Petitioner states that his trial counsel "failed to conduct the most 'rudimentary' inquiry to find if she thought this prospective juror could be fair toward the Petitioner" and, further, trial counsel's "failure to attempt to bar the seating of this potential biased juror constitutes ineffective counsel of a fundamental degree." (*Id.* at 13, 15).

During *voir dire* in Petitioner's case, the circuit court questioned the venire members regarding whether they could serve as fair and impartial jurors. The jurors who were related to deputies and the juror whose father was a magistrate unequivocally stated that such relationships in no way affected their ability to serve as jurors and that they could give fair and impartial consideration of all of the evidence in Petitioner's case. (ECF No. 13-1 at 14-17). The circuit court further questioned whether any of the prospective jurors were aware of any prejudice or bias for or against either party in the case and whether they knew of any reason that they could not sit as a juror and render a fair and impartial verdict based only on the law and the evidence that they heard in the courtroom. (*Id.* at 28). None of the prospective jurors answered in the affirmative. (*Id.*).

Petitioner does not assert, nor does the undersigned find upon review of the record, any basis for Petitioner's trial counsel to move to strike the foregoing jurors for cause. Moreover, Petitioner fails to show that his trial counsel's decision to not further question such jurors, move to strike them for cause, or exercise a peremptory strike against them

was constitutionally deficient. The jurors' responses during *voir dire* denied any actual or implied bias against Petitioner and there is no other indicia of juror bias on the basis of their familial relationships in the record. Petitioner does not identify any reasons that further questioning was warranted or constitutionally required in this case. Therefore, Petitioner fails to show that his trial counsel's representation was ineffective under the Sixth Amendment. *See, e.g., Ault v. Waid*, 654 F. Supp. 2d 465, 479 (N.D.W. Va. 2009), *aff'd*, 414 F. App'x 546 (4th Cir. 2011) (finding that counsel was not ineffective in not moving to strike a juror who was briefly acquainted with the victim when the juror responded during *voir dire* that she would not be influenced by such relationship); *Brock v. Wolfe*, No. PWG-13-750, 2015 WL 4386001, at *6–7 (D. Md. July 13, 2015) (counsel was not ineffective in failing to strike jurors who expressed that they could be fair and impartial); *Graybill v. Clarke*, No. 7:11-CV-00331, 2012 WL 3133691, at *22–23 (W.D. Va. July 31, 2012). Accordingly, Petitioner likewise fails to show that the juror's familial relationships denied him a fair and impartial jury.

   Petitioner also argues in his habeas petition that his counsel was constitutionally deficient in not lodging an objection or moving for change of venue based on the fact that there were no African Americans or "people of color" in the jury pool or on the jury panel, although, according to Petitioner, the population of African Americans in Fayette County is 2.7 percent. (ECF No. 1-1 at 15, 37). Petitioner contends that it violated his right to due process and equal protection to be tried by a jury from which members of his race had been excluded. (*Id.* at 37). Petitioner appeared to abandon at least his ineffective assistance of counsel claim in his response to Respondent's motion for summary judgment, stating that he agrees with Respondent that he cannot sustain a claim of ineffective assistance of counsel on this issue. (ECF No. 58 at 12). He does not otherwise

challenge Respondent's argument that the racial composition of Petitioner's jury pool and panel did not violate his constitutional rights. (ECF No. 58). The undersigned agrees that these claims fail.

In considering Petitioner's foregoing jury composition and ineffective assistance of trial counsel claims on habeas review, the circuit court applied the test established in *Duren v. Missouri*, 439 U.S. 357, 364 (1979) under which the Petitioner must show (1) that the group alleged to be excluded is a "distinctive" group in the community, (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. (ECF No. 1-2 at 18). The circuit court stated that the first prong was met, as African Americans are a "distinctive" group in the community. However, regarding the second factor, the circuit court cited the omnibus hearing testimony of Cathy Jarrett, the chief deputy county clerk of Fayette County, West Virginia, that potential jurors were selected at random from the annual licensed voter registration and licensed driver records in the county. (ECF No. 1-2 at 20-21). The circuit court found that "[u]nder the facts of this case, Petitioner was provided a jury that was randomly selected from two different broad sources" and "[n]othing in the manner, or method, of comprising the jury, worked to exclude any cognitive group." (*Id.* at 21). The circuit court noted that Petitioner did not adduce any statistical evidence or other evidence to show that African Americans or any other groups were underrepresented in the jury pool. (*Id.*). Finally, considering the third *Duren* factor, the circuit court stated that the selection of Petitioner's jurors was "completely random" from the registered voters and drivers in the county, which excluded any possibility of systematic discrimination. (*Id.* at 22). The circuit court found that

Petitioner failed to show that the random selection of venire members from those sources did not represent a fair cross-section of the community. (*Id.*). The circuit court indicated that although there were no African Americans on Petitioner's jury, it did not mean that the jury was not a fair cross-section of the community consistent with federal and state law constitutional requirements. (*Id.*). Therefore, the circuit court found that Petitioner's constitutional right to a jury of his peers was not violated when no "people of color" were empaneled in his case. (*Id.* at 22-23).

As to Petitioner's claim that his trial counsel was deficient for not objecting to the racial composition of the jury, the circuit court found that Petitioner "did not show any basis that would require his counsel to take action." (*Id.* at 23). The circuit court failed to see how trial counsel was objectively unreasonable in not objecting to what the circuit court found to be a constitutionally sound jury venire and jury selection process. (*Id.* at 24).

"Under the Sixth Amendment, criminal defendants have a right to be tried by a jury drawn from a fair cross-section of the community." *McDonald v. United States*, No. 1:10CR90, 2016 WL 4154711, at *6 (N.D.W. Va. Aug. 5, 2016), *appeal dismissed,* 685 F. App'x 257 (4th Cir. 2017) (citing *United States v. Jones*, 533 F. App'x 291, 298-99 (4th Cir. 2013). "To prevail on a Sixth Amendment fair cross-section claim, proof of underrepresentation in a particular panel or venire is not sufficient." *Id.* (quoting *United States v. Peoples*, 70 F.3d 113, 1 (4th Cir. 1995) (internal quotation marks omitted). Rather, in order to establish a *prima facie* case that a jury was unfairly selected because it contained no African-Americans, a petitioner must show that such result was a consequence of a "systematic exclusion to the jury-selection process." *Id.* To evaluate such a claim, the Fourth Circuit has adopted the aforementioned three-prong *Duren* test,

which the circuit court utilized to evaluate Petitioner's claim. *Id.* (quoting *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993)).

The fact that no "people of color" were empaneled in Petitioner's jury does not prove, *ipso facto*, that the jury did not represent a fair cross-section of the community, or that the jury selection procedure was unconstitutional. As the circuit court emphasized, Petitioner did not present *any* evidence that African Americans or other people of color were underrepresented in the jury pool in relation to the number of such individuals in Fayette County. Further, Ms. Jarrett's testimony at the omnibus hearing reflected that potential jurors in Fayette County were randomly selected by computer program and blind draw from the annual list of registered voters and licensed drivers in Fayette County. (ECF No. 13-9 at 91-96). Petitioner does not adduce, nor does the undersigned find, any evidence to support a finding that the jury selection procedure used in Petitioner's case systematically excluded "people of color."

Therefore, the undersigned **FINDS** that Petitioner's claim that his trial counsel was ineffective because she did not object to or question jurors with certain family relationships during *voir dire* is procedurally defaulted and to the extent that it is *not* procedurally defaulted, the claim is without merit. The undersigned further **FINDS** that the circuit court's decision on Petitioner's claims that his constitutional rights were violated with respected to the racial composition of his jury pool and panel was not contrary to, or an unreasonable application of, clearly established federal law. *See, e.g., McDonald*, 2016 WL 4154711, at *7–8 (finding that the petitioner failed to meet the *Duren* test and "[a]ccordingly, the result of his proceeding would not have been different had trial or appellate counsel challenged the racial makeup of the venires or juries."); *Harvey v. United States*, No. 1:13-CR-5, 2016 WL 4153614, at *4 (N.D.W. Va. Aug. 5, 2016)

46

(finding that the petitioner failed to meet the *Duren* test; therefore, counsel was not ineffective in failing to challenge the composition of the jury); *Ward v. Seifert*, No. CIV.A. 2:13-05312, 2014 WL 4929441, at *13–14 (S.D.W. Va. Sept. 30, 2014) (finding that because the petitioner was not unduly prejudiced by the jury selection process, he was unable to demonstrate that his counsels' performance during the *voir dire* process was ineffective). Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on these grounds, and that Petitioner's request for habeas relief on these grounds be **DENIED**.

### 7. Jury Bias

Petitioner next argues that his trial counsel ineffectively handled two issues of alleged juror bias and that such bias denied him his right to a fair and impartial jury. (ECF No. 1-1 at 26-28). First, as reflected in the trial transcript, the judge presiding over Petitioner's trial stated on the record that a juror approached the court reporter during the lunch hour recess and advised that the juror knew some of the spectators in the courtroom and wanted to know if it was something that should be disclosed. (ECF No. 13-1 at 119). Upon hearing this information, counsel for both parties agreed to move forward with the trial. (*Id.* at 119-20). The judge recounted at that time that the jurors confirmed during *voir dire* that they did not know any of the participants in the trial, including the parties or witnesses, and could serve as impartial and fair jurors in the case. (*Id.* at 120). The judge further stated that the mere fact that the juror was acquainted with a spectator in the crowd was not a basis to disqualify the juror. (*Id.*). Therefore, the judge stated that he concurred with counsels' judgment that the trial should proceed. (*Id.*).

Later, during jury deliberation, the jury foreman provided a note to the circuit court stating that the same juror who previously expressed recognizing spectators in the

courtroom was "now afraid of repercussions from the family" and the jury was "unable to move forward at this time." (ECF Nos. 1-1 at 27, 1-2 at 50, 13-1 at 370, 58 at 16, 58-1 at 2). The circuit court discussed the issue with counsel outside of the presence of the jury. The prosecution suggested that the circuit court issue a jury instruction, whereas Petitioner's trial counsel stated that the defense did not believe an instruction could cure the "taint of impartiality" that the note portrayed to the court. (ECF No. 13-1 at 371). The circuit court took a recess and ultimately decided to read to the jury portions of W. Va. Code § 61-5-27(c) (1999), which provided that it was unlawful to, *inter alia*, retaliate against a juror for performing his or her official duties in an official proceeding, as well as advise the jury of the prescribed penalties for such actions. (*Id.* at 374). Petitioner's trial counsel "strenuously object[ed]" to the instruction, arguing that the juror's expression of fear tainted the entire jury and made it impossible for Petitioner to receive a fair trial. (*Id.* at 375-76). Petitioner's counsel stated that although the jurors took an oath of impartiality, now that the note from the juror came to light, their impartiality was in question. (*Id.* at 378). The judge elected to amend the jury instruction further to discuss that the jurors' obligation was to decide the case fairly without prejudice for or against either side. (*Id.* at 378). Petitioner's trial counsel then moved for a mistrial, which the circuit court denied. (*Id.* at 378-79). The circuit court brought the jury back into the courtroom and stated:

> All right. And I have received a note from you dated today. I've shared that with counsel. And if I could have your attention on this particular issue, the jury will recall earlier today, under my instruction, as to what your functions are as a juror.
>
> I've earlier expressed to you that you are as much an official of this system as I am. You hold an official position as a juror. And the function of the jury is to determine facts. This should be done without prejudice, fear or favor and solely from a fair consideration of the evidence. You'll also recall that I asked the question during voir dire, "Is there any member of this jury that cannot render a fair and impartial verdict in this matter based solely on the

law and the evidence?" And every member of this panel indicated that they could.

Now, I can also inform you that intimidation of any court official, whether it be a prosecutor, a defense attorney, a judge or a juror or a witness, is a very serious offense. Under our law, it is unlawful for a person to cause injury or loss to a person or property or to threaten or attempt to do so with intent to retaliate against a juror or witness for performing his or her official duties in an official proceeding. A person convicted of such offense is guilty of a misdemeanor and shall be confined in jail for not more than one year or fined not more than $1,000.00 or both.

Oftentimes in cases like this, ladies and gentlemen, in deciding the facts, it's not easy. It's a difficult task. Your decision, unlike – similar to some of the decisions I make. You're going to make some people happy, you're going to make some people unhappy, but you have a duty to do.
And in this particular situation, I don't know what family you're talking about, whether it's the family of the victim or the family of the defendant. I don't know. But it should not play into your decision. Your decision is to render a verdict based solely on the evidence in this case, without fear or prejudice toward either side in this case, and the law protects you for making such a decision.

Now, that's the best instruction I can give you. With those instructions, you may retire to the jury room to consider further of your verdict.

(ECF No. 13-1 at 379-81). The jury then returned to the jury room to continue deliberations. Petitioner contends that his counsel should have requested individual *voir dire* of the jurors to determine if each juror was still impartial.

On habeas review, the circuit court considered Petitioner's claims that his trial counsel did not properly react to these communications from a juror. As to the first communication by the juror stating that she recognized spectators in the courtroom, the circuit court found that "the mere fact that a juror recognizes spectators in a courtroom, regardless of whether they are there to support the accused or the victim, does not operate to disqualify that juror from sitting on the jury." (ECF No. 1-2 at 46-47). The circuit court explained that given the small community, such a situation is expected. (*Id.* at 47-48). However, the circuit court did not find that the juror's affirmations to review the evidence

49

without bias or prejudice was in any way altered by the juror's recognition of spectators in the gallery. (*Id.* at 48). As to Petitioner's claim of ineffective assistance of counsel, the circuit court found that Petitioner's trial attorney was not deficient in taking no further action after the juror notified the court that she recognized some of the spectators in the gallery. (*Id.* at 49). Furthermore, the circuit court found that even assuming *arguendo* that Petitioner's trial counsel should have taken further action, Petitioner did not show "but for" this failure, there was a reasonable probability that the results of the proceeding would have been different. (*Id.* at 49-50).

Regarding the note stating that jury deliberations were stalled because a juror was "afraid of repercussions from the family," the circuit court noted on habeas review that Petitioner's trial counsel vehemently argued for a mistrial when the issue presented itself and strenuously objected to a curative instruction. (ECF No. 1-2 at 50). Further, the circuit court noted that Petitioner's trial counsel moved for a new trial on the same basis during sentencing. (*Id.* at 50-51). The circuit court reiterated that the standard for ineffective assistance of counsel is not to gauge in hindsight whether a different approach by counsel may be have been more effective. (*Id.* at 51). Rather, the inquiry is to determine, when viewing the circumstances as a whole, whether counsel acted outside the *wide range* of professionally competent assistance. (*Id.*) (emphasis in original). Applying the *Strickland* test to the foregoing facts, the circuit court determined that Petitioner's trial counsel's actions were not constitutionally deficient. (*Id.*).

"A defendant is guaranteed a trial by an impartial jury under the Sixth and Fourteenth Amendments." *Ward v. Seifert*, No. CIV.A. 2:13-05312, 2014 WL 4929441, at *13–14 (S.D.W. Va. Sept. 30, 2014) (citing *Sheppard v. Maxwell,* 384 U.S. 333, 362 (1966) ("Due Process requires that the accused receive a trial by an impartial jury free from

outside influence."). "Absent contrary indications, jurors are presumed to be impartial. *Poynter v. Ratcliff,* 874 F.2d 219, 221 (4th Cir.1989)" and "[t]he defendant bears the burden of showing a strong possibility of juror bias. *Wells v. Murray,* 831 F.2d 468, 472 (4th Cir.1987)." *Id.*

Here, a juror disclosed that she recognized spectators in the courtroom and later stated that she was afraid of repercussions from such spectators. The juror did not identify whether the spectators supported the victim or the accused. Regardless, Petitioner does not allege any facts which raised a presumption of prejudice. For example, there was no allegation that the spectators privately contacted the juror. *See, e.g, Fullwood v. Lee*, 290 F.3d 663, 678 (4th Cir. 2002) ("[A]ny private communication [or] contact ... with a juror during a trial about the matter pending before the jury is ... presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties" and the government bears the burden of rebutting the presumption of prejudice by showing that the contact with the juror was harmless to the defendant) (quoting *Remmer v. United States,* 347 U.S. 227, 229 (1954)).

Jurors are not rendered partial simply because they become aware of sentiment regarding a case. *Orbe v. True*, 201 F. Supp. 2d 671, 681–82 (E.D. Va. 2002) (citing *Stockton v. Com. of Va.*, 852 F.2d 740, 747 (4th Cir. 1988)). Indeed, a defendant's constitutional right to "[d]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation" because "[w]ere that the rule, few trials would be constitutionally acceptable." *Id.* The juror in Petitioner's case did not specify what caused her to fear retaliation from spectators in the gallery, but even something such as a threatening look would not raise a presumption of prejudice. *Orbe*,

201 F. Supp. 2d at 681–82 ("A glare directed at jurors is hardly the type of impermissible extrajudicial contact that gives rise to any doubt concerning the validity of a jury's verdict."). Further, as to Petitioner's claim that jurors should have been individually questioned, the Fourth Circuit has cited the Seventh Circuit, stating that "individual questioning, which may tend to unsettle the jury, is only warranted in cases where there is a strong indication of bias or irregularity." *United States v. Babb*, 369 F. App'x 503, 511 (4th Cir. 2010) (citing *United States v. Stafford,* 136 F.3d 1109, 1112-13 (7th Cir.1998)). Petitioner does not establish a strong indication of bias or irregularity in his case.

Therefore, having thoroughly considered the matter, the undersigned **FINDS** that the circuit court's decision that Petitioner's trial counsel was not constitutionally effective in responding to what Petitioner contends was indicia of jury bias was not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on this ground, and that Petitioner's request for habeas relief on this ground be **DENIED**.

### 8. *Jury Instruction*

As discussed in the preceding section, a juror in Petitioner's case identified that the juror knew spectators in the gallery and was afraid of repercussions from them. The trial court instructed the jurors that their duty was to decide the case based upon the facts presented to them in court irrespective of any other influence and instructed them that the law protects jurors from intimidation and retaliation. Petitioner argues that his trial counsel was constitutionally ineffective by not objecting to the foregoing "improper jury instruction" given by the circuit court, stating that "the instruction only added to the prejudice that was already a part of the jury's mental state" and "[i]n the jury's mind, Petitioner was now guilty of attempting to intimidate the jury." (ECF No. 1-1 at 19).

Petitioner further argues that the "improper instruction" denied him his right to a fair and impartial jury in violation of the fifth and fourteenth amendments. (*Id.* at 27, 34-35). He states that the instruction "poisoned the minds of the jurors even further," placing in their minds that "Petitioner's family has become a real threat to them all." (ECF No. 58 at 37).

In his state habeas proceeding, Petitioner likewise argued that the jury instruction was improper; however, he did not argue that his trial counsel was constitutionally ineffective for failing to object to the circuit court's instruction to the jury. (ECF Nos. 1-2 at 71-73, 13-7 at 19-20). Therefore, his ineffective assistance of counsel claim is procedurally defaulted and it is also without merit, as discussed below.

On habeas review, the circuit court discussed that a trial judge has discretionary authority to handle exigent circumstances that manifest during a trial. (ECF No. 1-2 at 71). The circuit court stated that in this case, it provided an instruction that was an accurate reflection of the law and was necessitated by the unusual circumstances that arose. (*Id.* at 72). Furthermore, the circuit court found that even if the instruction were improper, it would amount to ordinary trial error and did not violate Petitioner's constitutional rights. *(Id.* at 73). The circuit court observed that Petitioner presented this same issue in his direct appeal, which was refused by the SCAWV. (*Id.*); *see* (ECF Nos. 13-4, 13-5).

The undersigned does not find any basis for Petitioner's claim that the circuit court's instruction to the jury placed blame on Petitioner and/or his family. In fact, the presiding judge clearly stated that he did not know if the juror who expressed fear was referring to the victim's family or Petitioner's family. (ECF No. 13-1 at 381). At no time, did the circuit court insinuate that Petitioner, himself, was attempting to intimidate the jury. (*Id.* at 379-81). Petitioner simply does not adduce any grounds that the circuit court's

instruction to the jury violated his constitutional rights.

Petitioner's claim that his trial counsel was ineffective by not objecting to the circuit court's instruction to the jury is curious, as his trial counsel strenuously objected to the provision of a jury instruction and moved for a mistrial. (ECF No. 13-1 at 375-76, 378-79). Petitioner fails to show that his trial counsel's actions with respect to the circuit court's curative instruction to the jury was so deficient to essentially amount to an absence of counsel, nor does Petitioner show a reasonable probability that the outcome of his trial would have been different had his counsel taken other actions.

Therefore, the undersigned **FINDS** that the circuit court's decision that the instruction to the jury regarding intimidation did not violate Petitioner's right to a fair trial was not contrary to, or an unreasonable application of, clearly established federal law. Further, the undersigned **FINDS** that Petitioner's claim that his trial counsel was ineffective because she "did not object" to the circuit court's instruction to the jury is procedurally defaulted and to the extent that it is *not* procedurally defaulted, the claim is without merit. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on these grounds, and that Petitioner's request for habeas relief on these grounds be **DENIED**.

### 9. Tony Castanon

The victim's husband, Tony Castanon, testified that directly following the robbery, his wife attempted to describe the assailant to him, but was unable to provide much of a description:

> Q: And did she describe to you or did you ask her for a description of who did this to her?
>
> A: She was trying to tell me what he looked like, what he was wearing, but you know, I can't remember what color hoodie he was wearing.

(ECF No. 13-1 at 64).

Petitioner argues in his § 2254 petition that his trial counsel was constitutionally ineffective because she did not cross-examine Mr. Castanon regarding the "confusing identification of the assailant's description" that his wife gave him. (ECF No. 1-1 at 17). Respondent, on the other hand, argues that he is entitled to summary judgment on this claim because the "description" provided by Mr. Castanon provided "virtually no information" and any "inconsistency identified by Petitioner is an empty one;" as such, the decision to not continue questioning, and "allow the jury's focus to linger on a sympathetic witness" was a reasonable strategic decision by trial counsel. (ECF No. 51 at 19-20). Petitioner appears to resign this claim in his response to Respondent's motion for summary judgment, stating that he "refuses to waste the time of this honorable court on this issue. Respondent is correct in saying the description provides virtually no information, and that the inconsistency identified by Petitioner is an empty one." (ECF No. 58 at 29).

On habeas review, the circuit court "fail[ed] to see how, under the circumstances, any possible discrepancy, assuming that one existed, could have been beneficial to the Petitioner's case." (ECF No. 1-2 at 57). Further, the circuit court failed to see how trial counsel "was obligated, under a reasonably objective standard, to further explore Mr. Castanon's testimony," given that "[a]ny testimony elicited could have been as harmful, as opposed to helpful, to Petitioner's case." (*Id.*).

The undersigned agrees with the parties and with the circuit court that Petitioner presents a baseless claim of ineffective assistance of counsel. A decision to badger the victim's husband regarding the minimal description that his wife provided to him could

very well have prejudiced Petitioner more than served his defense. Certainly, this strategic choice was not outside the bounds of what a reasonable attorney would have done under the circumstances. Based upon the above, the undersigned **FINDS** that the circuit court's decision that Petitioner's trial counsel was not constitutionally ineffective because she did not cross-examine Mr. Castanon was not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on this ground, and that Petitioner's request for habeas relief on this ground be **DENIED**.

### 10. Admonishment of Spectators

During Petitioner's trial, after the state concluded its opening argument and just before Petitioner's trial counsel presented her opening argument, the circuit court stated:

> Well, before you begin, Ms. Kearney, I need to make a comment to members of the audience. This is a criminal jury trial. It is open to the public. Anyone in the world is welcome to come in here and observe these proceedings, as long as their conduct is proper. Now, a few moments ago, I have noticed some signs of approval or disapproval from certain members of the audience as to what one of the attorneys was saying and turned around and made some comments to another individual in the audience.

> That is improper. I am not going to permit any member of the audience to either show approval or disapproval of anything that's said in here and in some way try to influence this jury.

> As I say, you're welcome to sit here and observe; but by your mannerisms, you're not to indicate approval or disapproval of anything you hear in this courtroom. And I give you that word of warning so that you'll know how to conduct yourself in this proceeding. So I trust you'll be you'll follow the rules of the Court; otherwise you'll be excluded from the courtroom.

(ECF No. 13-1 at 54). Later in the trial, outside of the presence of the jury, the circuit court admonished certain spectators regarding inappropriate behavior; advised the gallery of spectators regarding the strict laws against intimidation or harassment of court officials, employees, jurors, or witnesses; and advised the spectators that demonstrations would

not be tolerated in response to the jury's verdict. (ECF No. 13-1 at 179-80, 381-83, 385).

Petitioner argues that the circuit court's admonishment of spectators "was beyond reasonable." (ECF No. 1-1 at 19). He further states that "[t]hese individuals, were reprimanded without due cause and once again trial counsel did nothing to preserve or protect the record or Petitioner." (*Id.*).

On habeas review, the circuit court discussed its broad, inherent authority to maintain order and decorum in its proceedings. (ECF No. 1-2 at 52). The circuit court stated that "aside from a general cautionary warning to the gallery during opening statements, the Court conducted admonishments outside the presence of the jury and in the presence of [Petitioner]." (*Id.* at 54). The circuit court indicated that a trial court is obligated to ensure that the proceeding is orderly, just, and impartial and, in this case, the circuit court "took cautionary action to ensure that no manifest injustice was allowed to affect any of the trial's participants." (*Id.*). Therefore, under the circumstances, the circuit court "fail[ed] to see how a reasonably proficient trial attorney would have reacted any differently" than Petitioner's trial counsel and Petitioner failed to establish that his trial counsel's performance was deficient under *Strickland's* objective standard of reasonableness. (*Id.*). Further, the circuit court concluded that "neither the giving of the general cautionary warning in the presence of the jury, nor the admonishment of spectators outside the presence of the jury, operated in any manner to violate the Petitioner's right to a fair trial under the United States Constitution and the West Virginia Constitution." (*Id.* at 66).

Petitioner fails to show how the circuit court's cautionary instruction, directed to no particular person or group, violated his federal or constitutional rights. Further, as the circuit court stressed, the circuit court's other statements to the gallery of spectators were

not given in the presence of the jury. Therefore, such statements cannot be argued to have influenced the outcome of Petitioner's trial. Consequently, Petitioner's statement that his trial counsel "did nothing" to protect Petitioner or the record does not meet the *Strickland* standard.  Based upon the above, the undersigned **FINDS** that the circuit court's decision that the court's statements to spectators did not violate Petitioner's right to a fair trial and did not provide grounds for ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that Respondent's motion for summary judgment be **GRANTED** on these grounds, and that Petitioner's request for habeas relief on these grounds be **DENIED**.

### 11. Inexperience

Petitioner alleges that this was his trial counsel's first jury trial at any level and she was "not prepared for a trial of this magnitude." (ECF No. 1-1 at 15). Therefore, Petitioner states that when his trial counsel's more experienced co-counsel fell ill, his trial counsel should have asked for a continuance. (*Id.*).

On habeas review, the circuit court explained that an attorney's level of experience has little bearing on a claim of ineffective assistance of counsel. (ECF No. 1-2 at 14). "To hold that an attorney's first trial was in and of itself a basis for ineffective assistance of counsel claims, would open the 'floodgates' to post trial proceedings." (*Id.*). The circuit court stated that such a precedent would "chill any attorney from stepping into the courtroom, because every counsel has to have [his or her] *first* trial." (*Id.*) (emphasis in original). The concern is not what a more experienced attorney, or even the best attorney would have done, but what a reasonable attorney would have done under the circumstances based upon an objective standard. (*Id.*). In this case, the circuit court found

that Petitioner's trial counsel "spent a significant amount of time conducting a reasonable and adequate investigation of Petitioner's case and the mere fact that Petitioner's jury trial was [her] first jury trial, as lead counsel, does not support a finding of ineffective assistance of counsel." (*Id.* at 15).

An attorney's "prior trial experience—regardless how large or small—does not establish *ipso facto* whether he [or she] was constitutionally ineffective." *Smith v. United States*, No. 1:03-CR-39, 2009 WL 6731814, at *7 (N.D.W. Va. Aug. 3, 2009), *report and recommendation adopted,* 2010 WL 3087454 (N.D.W. Va. Aug. 6, 2010) (citing *Kandies v. Polk,* 385 F.3d 457, 469 n. 7 (4th Cir. 2004) (vacated on other grounds by *Kandies v. Polk,* 545 U.S. 1137 (2005)); *see also United States v. Beilharz*, No. 1:09-CR-105, 2012 WL 2153157, at *9 (E.D. Va. June 12, 2012) ("Ultimately, however, the level of an attorney's experience is irrelevant if the attorney provides competent representation in the case at hand; inexperience itself does not constitute ineffectiveness.").

Rather, "[w]hen considering an ineffective assistance of counsel claim, the attorney's actual performance is examined, rather than his or her experience, which is an indicator of the attorney's likely performance." *Smith*, 2009 WL 6731814, at *7 (citing *Kandies,* 385 F.3d at 469 n. 7). Here, Petitioner has failed to prove that his trial counsel's actual performance fell "below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687.

All of the grounds upon which Petitioner bases his claim that his trial counsel was deficient due to her supposed lack of experience have been found to be without merit by the undersigned in the preceding sections, including Petitioner's claims that his trial counsel was ineffective in not challenging the photographic line-up, soliciting through cross examination testimony regarding why blood samples and shoe prints were not

collected and analyzed from the scene, objecting to Detective Sizemore's testimony and investigating his claim that the pepper spray contained marking dye, additional questioning or striking of certain jurors due to their familial relationships, objecting to the racial composition of the jury panel, questioning Tony Castanon regarding the description his wife provided him, requesting *voir dire* of jurors after one of them expressed fear of repercussions from Petitioner's family, challenging the circuit court's instruction to the jury regarding intimidation, and objecting to the circuit court's admonishment of spectators. (ECF No. 1-1 at 15-24).

Moreover, as cited by the circuit court, Petitioner's case was certainly not his trial counsel's first trial. (ECF No. 1-2 at 14). Rather, this was simply his trial counsel's first jury trial as a lead attorney. (ECF No. 13-9 at 26). Moreover, Petitioner was represented by two lawyers who specialized in criminal law; one of whom was a senior public defender. (*Id.* at 46). Regardless, even if Petitioner's case was trial counsel's first court appearance, that fact is not the focus of the *Strickland* inquiry. Petitioner does not establish that his trial counsel's performance was constitutionally deficient, nor does he show a reasonable probability that her actions affected the outcome of his trial.

### 12. Appellate Counsel

Petitioner's direct appeal asserted one ground, arguing that the circuit court's instruction to the jury regarding intimidation was improper. (ECF No. 13-4). Petitioner contends that although the one assignment of error "was of good point," his appellate counsel was ineffective because she did not consult him prior to filing his direct appeal, "leaving out major trial errors." (ECF No. 1-1 at 42). In Petitioner's state habeas proceeding, the circuit court found that Petitioner did not present any testimony or evidence regarding his claim that his appellate counsel was constitutionally ineffective;

therefore, the circuit court found that the ground was abandoned or waived. (ECF No. 1-2 at 73). It does not appear that Petitioner appealed the circuit court's finding on this claim to the SCAWV. (ECF Nos. 1-3, 13-7).

Respondent argues that he is entitled to summary judgment on this ground for relief because the "record reflects that Petitioner's failure to actively pursue his ineffective assistance of appellate counsel claim in state court resulted in the state court declining to address the merits of that claim." (ECF No. 51 at 31). Petitioner has not directly addressed Respondent's position as to procedural default, nor has he asserted an exception based upon cause and prejudice or argued that a fundamental miscarriage of justice would occur if the claim were not addressed on its merits. (ECF No. 58). Notably, even if Petitioner were to blame his attorney for not developing or advancing this claim in his state habeas proceedings, it does not qualify as cause and prejudice to allow this court to address this defaulted claim. *See Green v. Ballard*, No. CIV.A. 3:02-1348, 2015 WL 1612198, at *22 (S.D.W. Va. Apr. 10, 2015) (discussing that "in certain, limited situations, state habeas counsel's ineffectiveness may excuse a procedural default and permit a court to reach the merits of an ineffective assistance of *trial* counsel claim," but "this rule does not, however, apply to claims of ineffective assistance of *appellate* counsel.") (citations omitted).

Having thoroughly considered the matter, the undersigned **PROPOSES** that the District Court **FIND** that Petitioner's claim as to ineffective assistance of appellate counsel is procedurally barred. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on this ground of the petition. *See, e.g., Green*, 2015 WL 1612198, at *43 (also discussing that the court need not address the merits of a procedurally defaulted claim).

### B. Actual Innocence

Finally, although Petitioner styles "Ground One" of his petition as a claim that he is actually innocent of the crime of which he was convicted, he does not assert any new evidence or witnesses that would purportedly establish his innocence. (ECF No. 1-1 at 2-13). Rather, Petitioner argues that if the evidence available at the time of his trial "was used properly in the defense of Petitioner, it is more likely than not, that no reasonable juror would have convicted" him. (*Id.* at 2).

It appears that Petitioner intends to rely on the rule established by the Supreme Court of the United States in *Schlup v. Delo*, 513 U.S. 298 (1995) by which a federal court can consider claims that would otherwise be procedurally barred based upon a showing of new evidence, which, if it had been presented at trial, would have made it "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 536–37 (2006) (citing *Schlup*, 513 U.S. at 327); *United States v. Jones*, 758 F.3d 579, 583 (4th Cir. 2014). According to *Schlup*, this formulation "ensures that petitioner's case is truly 'extraordinary,' while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Id.* Importantly, the actual innocence exception is not a freestanding claim for habeas relief, but is rather a gateway for a federal court to consider otherwise defaulted claims. *Boothe v. Ballard*, No. 2:14-CV-25165, 2016 WL 1275054, at *52 (S.D.W. Va. Mar. 31, 2016), *aff'd,* 670 F. App'x 193 (4th Cir. 2016); *Dreyfuse v. Pszczokowski*, No. CV 3:16-06717, 2017 WL 470908, at *1 (S.D.W. Va. Feb. 3, 2017); *Roberts v. Hejirika*, No. AW-11-CV-868, 2013 WL 2154797, at *8 (D. Md. May 16, 2013). "To be credible, ... a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts,

or critical physical evidence—that was not presented at trial." *Booth*, 2016 WL 1275054, at *53 (citing *Schlup*, 513 U.S. at 324).

Federal courts of appeals have disagreed on the meaning of "new" within the "new reliable evidence" language of *Schlup*. *See Kidd v. Norman*, 651 F.3d 947, 952 (8th Cir. 2011) (discussing circuit split). "The Seventh and Ninth Circuits have interpreted this phrase to mean evidence is 'new' for purposes of a *Schlup* analysis so long as it was 'not presented' at trial," whereas, "the Third Circuit agrees with [the Eighth Circuit] that evidence is 'new' only if it was not available at the time of trial through the exercise of due diligence." *Kidd*, 651 F.3d at 952. The Fourth Circuit has yet to definitively stake its position on the meaning of the term "new" evidence in the actual innocence context, although at least three district courts within the Fourth Circuit have interpreted the term "new" to require newly discovered evidence. *See Graham v. Warden, Wallens Ridge State Prison*, No. 1:14cv922, 2016 WL 183541, at *2 (E.D. Va. Jan. 13, 2016); *Bolt v. United States*, No. 6:08-cr-00213-GRA, 2014 WL 1094382, at *3 (D.S.C. Mar. 17, 2014); *United States v. Barajas*, No. 5:13CV80574, 2013 WL 5720339, at *1 (W.D. Va. Oct. 18, 2013).

Under either interpretation of "new," however, when deciding a petitioner's gateway innocence claim under *Schlup*, the court "must consider 'all the evidence' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327-28). Further, in assessing the new evidence presented, a habeas court may consider how the "timing of the submission" of the evidence and "the likely credibility" of the source of the evidence bears on the reliability of that evidence. *Schlup*, 513 U.S. at 332.

Even assuming that evidence need only be newly presented, as opposed to newly

discovered, to establish actual innocence, Petitioner still fails to meet the "demanding" standard set out in *Schlup*. *See Teleguz v. Zook*, 806 F.3d 803, 809 (4th Cir. 2015), *cert. denied,* 137 S. Ct. 95 (2016). Although the evidence of Petitioner's guilt in this case may not be overwhelming, he certainly has not demonstrated that "it is more likely than not that no reasonable juror would have convicted him in the light" of the "new" evidence that he offers.

Petitioner's purportedly "new" evidence includes the 911 recording wherein the victim provided a description of her attacker as "very very black" and the victim's later description to law enforcement that the robber was light complected, as reflected in a press release by the Fayette County Sheriff's Office. (ECF No. 15 at 4; ECF No. 16-1 at 10). Petitioner also emphasizes the two to three inch discrepancy in the victim's description of the suspect's height when her written statement to police is compared with the Sheriff's Office press release. (ECF No. 15 at 4). At trial, Petitioner's counsel attempted to impeach the victim's identification by questioning her about the description she provided to a 911 operator. (ECF No. 13-1 at 184-85). The victim testified that she did not remember telling the 911 operator that her attacker was "very very black," but conceded that, if the 911 recording contained that description, then she would not dispute it. (*Id.* at 185). Petitioner faults his counsel for not later introducing the 911 recording into evidence; however, Petitioner fails to appreciate the potential negative impact of the jury listening to a 911 recording of the victim during an undoubtedly frantic situation. Moreover, counsel presented the 911 tape's description of the assailant's complexion through her questioning of the victim. Additionally, the jury was made aware during Chief Deputy Canterbury's testimony that the victim had described the robber as six feet one inch tall and light complected. (*Id.* at 94).

Accordingly, given the evidence adduced at trial, this "new" evidence may not be newly presented at all; rather, it appears to be duplicitous of the testimony heard by the jury.[5] Nonetheless, even accepting this evidence as "new," considering that the victim identified Petitioner as her attacker during a photographic lineup, which the circuit court concluded was "not suggestive" and was created consistent with state statutory "suggestions" for photographic lineups, the undersigned cannot conclude that further impeachment evidence of the victim's descriptions of her assailant makes it is more likely than not that no reasonable juror would have convicted him. (ECF No. 1-2 at 37). Similarly, the victim identified Petitioner as the robber in open court during trial, which further undercuts his actual innocence argument.[6] (ECF No. 13-1 at 178).

Petitioner also argues that other evidence never presented to the jury helps him meet the rigorous *Schlup* standard. For instance, Petitioner asserts that there was "exculpatory" evidence at the crime scene that was never tested, including blood and a possible shoe print. (ECF No. 15 at 6). However, Petitioner has not presented to this Court any expert analysis of this evidence that would exculpate him. Moreover, by omission at trial, the jury was aware that this evidence was not tested by law enforcement, and no link between Petitioner and the blood or potential shoe print was presented to the jury. Petitioner's claim that the physical evidence at the crime scene exonerates him, by itself, is insufficient to meet the *Schlup* standard.

Likewise, Petitioner's claim that a jury would not have convicted him had they known that the green spots on his face during the alternate light source testing could have

---

[5] During closing argument, Petitioner's trial counsel stressed the "varying descriptions" of the perpetrator's skin color and clothing provided by the victim. (ECF No. 13-1 at 353).

[6] Petitioner's left-handedness and his description of the clothing that he was wearing on the day of the robbery also lend some support to the victim's identification.

resulted from a number of other substances, including saliva, is unconvincing. Petitioner's trial counsel did argue in closing that "all sorts of substances produce different types of reactions under" alternate light sources, citing Ms. Foster's testimony that gun powder may fluoresce during alternate light source testing and an officer's testimony that an alternate light source test could identify the presence of semen. (ECF No. 13-1 at 356). However, Petitioner has failed to come forward with record support for his contention that the *same* bright green spots could be produced by multiple other substances under the same testing conditions. Furthermore, the jury was made aware that that the alternative light source test does not allow the administrator to detect the specific make-up of the chemical that is being observed, which goes to the heart of Petitioner's claim. (*Id.* at 146-47).

Finally, Petitioner asserts that his counsel failed to subpoena three alibi witnesses for trial. (ECF No. 15 at 11-12). Nonetheless, Petitioner has not provided the names of these witnesses or described the substance of their testimony and how it would have differed from the testimony provided by the alibi witnesses called by defense counsel at trial. As such, Petitioner's argument fails for lack of detail and lack of proof.

In sum, the "new" evidence argued by Petitioner is insufficient to leap *Schlup's* extraordinarily high hurdle. The victim identified Petitioner as her attacker during a photographic lineup and at trial, and Petitioner professed his innocence through an alibi defense. The jury credited the victim's testimony and rejected Petitioner's alibi. The undersigned finds no obvious reason to conclude that the victim was mistaken. Considering all of the evidence, Petitioner has failed to show that "it is more likely than not that no reasonable juror would have convicted him" in light of the "new" evidence he describes in his memoranda. *McQuiggin v. Perkins*, 133 S.Ct. at 1935 (quoting *Schlup*,

513 U.S. at 327).

For the above reasons, the undersigned **FINDS** that Petitioner cannot avail himself of the actual innocence exception. Accordingly, the undersigned **RECOMMENDS** that Respondent be granted summary judgment on this ground of the petition.

## IV.    <u>Proposal and Recommendations</u>

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** as follows:

1. Respondent's Motion for Summary Judgment, (ECF No. 56), be **GRANTED**;

2. Petitioner's Petition for a Writ of Habeas Corpus by a Person in State Custody, (ECF No. 1), be **DENIED**; and

3. That this action be **DISMISSED, with prejudice**, and removed from the docket of the court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Petitioner shall have fourteen days (filing of objections) and three days (if this document is received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of

Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Petitioner, Respondent, and any counsel of record.

**FILED:** November 20, 2017

Cheryl A. Eifert
United States Magistrate Judge